ELISHA BLOOMER, APPELLANT, *v.* JOHN W. McQUEWAN, ALLEN R. McQUEWAN, AND SAMUEL DOUGLAS, PARTNERS, UNDER THE NAME OF McQUEWANS & DOUGLAS.

The patent for Woodworth's planing machine was extended from 1842 to 1843, by the Board of Commissioners.
Under that extension, this court decided, in Wilson *v.* Rousseau, (4 How. 688,) that an assignee had a right to continue the use of the machine which he then had.
In 1845, Congress, by a special act, extended the time still further from 1849 to 1856. Under that extension, an assignee has still the same right.
By the cases of Evans *v.* Eaton, (3 Wheaton, 548,) and Wilson *v.* Rousseau, (4 How. 688,) these two propositions are settled, viz.:
1. That a special act of Congress in favor of a patentee, extending the time beyond that originally limited, must be considered as ingrafted on the general law.
2. That, under the general law in force when this special act of Congress was passed, a party who had purchased the right to use a planing machine during the period to which the patent was first limited, was entitled to continue to use it during the extension authorized by that law, unless there is something in the law itself to forbid it.
But there is nothing in the act of Congress, passed in 1845, forbidding such use; and, therefore, the assignee has the right.

*Mr. Justice Curtis,* having been of counsel, did not sit on the trial of this cause, and *Mr. Justice Wayne* was absent.

THIS was an appeal from the Circuit Court of the United States for the Western District of Pennsylvania, sitting as a Court of Equity.

It was a bill filed by Bloomer, who claimed under Wilson, the assignee of Woodworth's planing machine. The whole of

Wilson's title is set forth in the report of the case of Wilson *v.* Rousseau, 4 Howard, 646, as is also the act of Congress passed on the 26th February, 1845, (4 How. 662,) extending the patent for seven years from the 27th of December, 1849.

McQuewan claimed, through two *mesne* assignments from Woodworth and Strong, by virtue of a license granted on the 8th of November, 1833.

The bill and answer covered a great deal of ground, which need not be noticed in this report.

Amongst other averments was this, that the license conveyed no right to use the machine during the extension for seven years from 1849, under the act of Congress passed in 1845; and the decision of the court being in favor of the defendants below upon this point, it is unnecessary to state all the points and arguments upon other matters.

The court below were divided in opinion, and the bill was of course dismissed. Bloomer appealed to this court.

It was argued by *Mr. Keller* and *Mr. St. George T. Campbell*, for the appellant, and *Mr. Dunlop*, for the appellees.

The fourth point made by the counsel for the appellant was as follows:

IV. Whether the licensee of a right to use the patented machine for the original term of the patent, is entitled to continue the use of the same during the extension by Congress.

The facts in this regard appearing by the record, are

1. That Collins and Smith, who were assignees for the first term of the district in question, granted to Barnet the right for the city of Pittsburg and Allegnany county, "to construct and use during the residue of the said terms of fourteen years," the patented machine, and by the same assignment covenanted "not themselves to construct and use," nor to give license to any other person than Barnet "during the terms aforesaid," and Barnet covenanted not to construct more than fifty machines "during the terms aforesaid."

(The word "terms" is used in the plural, as it will be perceived by the assignment that the grantors were the owners also of the Emmons patent, and that the limitation of his right applied to the duration of both.)

2. Barnet assigns all his "right, title, interest, and claim of the within patent for Woodworth's planing machine to G. Warner and John W. McQuewan, their heirs and assigns," except seven rights previously given.

3. It seems to have been granted, below, that Warner had assigned his license to McQuewan, and McQuewan to the two

co-defendants, and that the machine was made during the first term of the patent; hence arises the question, have the appellees the right to continue its use during the congressional extension?

For the appellants it is submitted:

1. That this question, and the principles upon which it must be decided, have been already passed upon by this court.

In Wilson v. Rousseau, (4 Howard,) the question was of the right of the licensee to continue the use of the machine during the extension by the commissioner. The court were divided in opinion. In that delivered as their judgment, the right of the licensee to the continued use was put exclusively upon the terms of the 18th section, which were, " The benefit of such renewal shall extend to assignees and grantees of the right to use the thing patented, to the extent of their respective interests therein." Without that provision it is conceded by the learned judge, in delivering the opinion of the court, " that all the rights of assignees or grantees, whether in a share of the patent or to a specified portion of the territory held under it, terminate at the end of the fourteen years, and become reinvested in the patentee by the new grant."

" From that date he is again possessed of ' the full and exclusive right and liberty of making, using, and vending to others the invention,' whatever it may be, not only portions of the monopoly held by assignees and grantees, as subjects of trade and commerce, but the patented articles or machines throughout the country, purchased for practical use in the business affairs of life, are embraced within the operation of the extension. This latter class of assignees and grantees are reached by the new grant of the exclusive right to use the things patented. Purchasers of the machines, and who were in the use of them at the time, are disabled from further use immediately, as that right became vested exclusively in the patentee. Making and vending the invention are prohibited by the corresponding terms of his grant."

And the learned Judge, in expressing the opinion of the court, further declared that the provision in the 18th section, above referred to, was " intended to restore or save to them," (those in use of the thing patented at the time of the renewal,) " that right which, without the clause, would have been vested again exclusively in the patentee."

And the learned Judges who dissented from the opinion of the court did so upon the ground that even this clause of the 18th section did not confer upon the licensees the right claimed in their behalf.

Thus it is clear that the extension of a patent by lawful

authority revests in the patentee every right originally possessed by him, and that unless the law, by virtue of which it is extended, contains a provision in favor of licensees or assignees, their right to use ends with the term of their license. (This, of course, does not apply to cases where the patentee has covenanted to grant any subsequently acquired extensions — none such is pretended in this case.)

Applying, then, these principles to the act extending this patent, (February 26, 1845,) it will be seen that it contains no such provision as is to be found in the 18th section of the act of 1836; and that, therefore, in accordance with the opinion of all the judges, the entire right was reinvested in the patentee.

The general power to renew and extend a patent is conferred by the 18th section of the act of 1836, which, after providing for the proof of the prerequisites, declares that " it shall be the duty of the Commissioner to renew and extend the patent, by making a certificate thereon of such extension for the term of seven years from and after the expiration of the first term."

The act in question provides that the patent " be, and the same is hereby extended for the term of seven years from and after the 27th of December, 1849, and the Commissioner of Patents is hereby directed to make a certificate of such extension in the name of the administrator of William Woodworth, and append an authenticated copy thereof to the original letters-patent," &c.; the words being substantially the same as these, judicially construed, and the intention being still further marked, as well by the omission of any provision for the licensees, as by the express insertion of the name of the party in whose favor the extension was made, and to whose benefit it was intended to enure.

The principles upon which the judgment in Wilson v. Rousseau, is founded, are, it is submitted, if possible, more conclusively applicable to the case of such an extension by Congress than to one made by the Commissioner.

Such, too, has been the application made of them by many of the learned Judges in their circuits. By Mr. Justice Nelson, July 22, 1850, in Gibson v. Gifford, in a written opinion delivered by him; by the late Mr. Justice Woodbury, July, 1850, in Mason v. Tallman, also in a written opinion; and by Mr. Justice McLean, October 22, 1850, in Bloomer v. Stately.

The opinion of Mr. Justice Woodbury refers to similar decisions made by the late Justice McKinley, by Judge Ware, and Judge Sprague.

It may be proper, with reference to the argument founded upon the supposed intention of Congress, (not declared in the words of the act as already shown,) to permit a continued use

during the congressional extension of machines licensed under the original term, to annex a list of the patents, extended by special acts, and thus to refer to the provisions in each, expressly declaring, where such was intended, the existence of such right, and providing for its mode of exercise or enjoyment.

The absence of such provision in the act of 1845, must, it is submitted, conclusively negative any idea of such intention, even if the judicially decided effect of such an act did not render a reference to such a source for interpretation, unnecessary.

I. January 21, 1808, to Oliver Evans, 6 Stat. at Large, 70. (With special provision for parties then using invention.) Under this act the cases of Evans v. Jordan, 9 Cranch, 199, and Evans v. Eaton, 3 Wheat. 454, were decided.

II. March 3, 1809, to Amos and William Whittemore, 6 Stat. at Large, 80, (without provision for licensees.)

III. February 7, 1815, Oliver Evans (steam engine,) 6 Stat. at Large, 147, (with proviso that no greater sum should be charged for constructing and using, than was during prior term, and subject to existing patent laws.)

IV. March 3, 1821, Samuel Parker, 6 Stat. at Large, 262, (subject to provision of then existing patent laws.)

V. March 2, 1831, John Adamson, 6 Stat. at Large, 458, (without proviso or reference to existing laws.)

VI. March 3, 1831, Samuel Browning, 6 Stat. at Large, 467, (without proviso and reference to existing laws.)

VII. May 19, 1832, Jethro Wood, 6 Stat. at Large, 486, (proviso in favor of licensees that the price shall not be advanced.)

VIII. June 30, 1834, Thomas Blanchard, Stat. at Large, 589, (with special proviso in favor of licensees.) (It may not be improper to refer to the opinion of B. F. Butler, Attorney-General, May 25, 1837, that under this act the United States had no right to use, except on the conditions of the original grant.)

IX. March 3, 1835, Robert Eastman, 6 Stat. at Large, 613, (without proviso or reference to existing laws.)

X. July 2, 1836, James Barron, 6 Stat. at Large, 678, (extending two patents without proviso in reference to existing laws, and the other with provisos in reference to licensees.)

XI. February 6, 1839, Thomas Blanchard, 6 Stat. at Large, 748, (with proviso in favor of licensees.)

XII. March 3, 1845, William Gale, 6 Stat. at Large, 895, (authorizing renewal of patent under eighteenth section of act of 1836, although it had expired, and subject to the restrictions of that act.)

XIII. March 3, 1843, Samuel K. Jennings, 6 Stat. at Large, 899, (directing Commissioner to renew patent, subject to provisions of existing laws.)

XIV. February 26, 1845, William Woodworth, 6 Stat. at Large, 936, (extending patent. Commissioner to certify to the extension in the name of the administrator — no proviso in favor of licensees, or reference to existing laws.)

XV. February 15, 1847, Thomas Blanchard, 9 Stat. at Large, 683, (with proviso in favor of licensees, on terms to be agreed or adjusted by the Circuit Court, &c.)

The point that, by an accidental error in the bill, the word "fourteen" was inserted, instead of "twenty-eight," is not deemed a proper subject of objection in this court. No such ground appears to have been taken below; the patent itself forms part of the record, and an amendment would have been, it is submitted, instantly allowed by the court below, had the objection been there made. That the patent on its face was for twenty-eight years, forms one of the objections of the appellees to its validity, and the error complained of is set right by answer of the defendants themselves.

It is not deemed necessary by the appellants to present any authorities to meet the point argued by the appellees, that an act of Congress, extending a patent for seven years, is unconstitutional and void.

It is therefore submitted that the decree should be reversed, and that the appellant is entitled to a perpetual injunction and an account.

The counsel for the appellees made several points, amongst which was the following:

1. That defendants are protected as assignees.

The bill (pages 14 to 20) asserts, and the answer admits, that the respondents claim to use the machine they are alleged to have infringed, as assignees, from 1833, the year of their purchase, under assignments from the original patentee. Being then assignees under the original patent, can they claim to continue unmolested in the use of the machine they purchased and paid for, and have erected and used for seventeen years?

Was it the design of the act of 1845, to bring disasters upon the respondents, to deprive them of the rights they had acquired in good faith, to depreciate their property, to render useless their establishments, in which they had invested large sums of money, to destroy their business, and disable them from the performance of their contracts? Such flagrant outrages are not to be imputed to a statute, unless the terms of it imperatively demand it.

The language of the act calls for no such harsh, unreasonable, and impolitic construction. It is a simple extension of the patent of 1828, and nothing more. Could any design in Con-

gress to spread such disasters, be predicated of the simple meaning of this statute?

Chief Justice Gibson, of Pennsylvania, has laid down a rule which must commend itself to the judgment of every one,— that in the construction of statutes, the Judges, when one of those cases of hardship occurs, which continually arise, should do what their consciences irresistibly persuade them the legislature would have done, if the occurrence had been foreseen. Pennock v. Hart, 8 S. & R. 369.

And can any one doubt that if the idea of the propriety of protecting the purchasers of rights, and the uses of the thing patented, had been suggested, but they would immediately have inserted such a clause?

This act of 1845 is a private act, made for the special benefit of a particular individual, and should not have such construction as will be detrimental to others. Chief Justice Parsons, in the case of Coolidge v. Williams, has laid down the rule to be that private statutes, made for the accommodation of particular citizens or corporations, ought not to be construed to affect the rights or privileges of others, unless such construction results from express words, or from necessary implication. 4 Mass. 145.

There are no express words in this statute, which demands the construction contended for by the plaintiff.

We may appeal, too, to the language of Mr. Justice Washington, in the case of Evans v. Jordan, that arguments founded upon hardship, would be entitled to great weight, if the language of the act was not so peremptory as to forbid a construction at variance with the clear meaning of the legislature 9 Cranch, 199.

There are no words in this act to justify such savage construction as urged by the plaintiff. It declares a simple extension of the patent, and manifestly intends an extension similar to that which may be conferred by the Patent-Office, under which the rights of persons, using the invented machine under license, are protected in the enjoyment of it.

The same learned Chief Justice of Massachusetts, has also declared in the case of Wales v. Stetson, that in the consideration of the provisions of any statute, they ought to receive such a reasonable construction if the words and subject-matter will admit of it, as that the existing rights of the public or individuals be not injured. 2 Mass. 146.

If the legislature meant a simple extension of the patent for seven years, is it not a reasonable construction to suppose that it meant an extension, as ordinarily understood; as an extension of the nature of the extensions of the Patent-Office, and

46*

with the restrictions and privileges of such extensions? Is it not reasonable to conclude that they had in their mind the general act of 1836, and the clause which gave to purchasers and users of the thing patented, the right to continue that use? Is it not a reasonable construction that they meant that this special act should be construed in reference to the general law of the land? The language of the act is, that the patent of 1828 "be extended for seven years." Now what benefit would that extension be, even to complainant, without an incorporation with the general law? How could he be assignee of the right? how could he enjoy the use of the patent? how could he pretend to recover damages, without an appeal for aid to the act of 1836? The plaintiff is obliged to invoke the aid of the general law, to maintain this very action. The very plaintiff in this cause is an assignee, and undertakes to maintain this action in his own name, by calling into requisition the act of 1836.

The rule of law undoubtedly is, that laws on the same subject are to be construed together; that laws on the same subject are to be construed *pari passu*, and with reference to parallel legislation. This is clearly the rule as to general laws, which in relation to the same subject, are to be construed as one act. They are to be construed, too, in reference to parallel legislation. Penn v. Hamilton, 2 Watts, 60; 17 S. & R. 81; 7 Id. 404.

The right of appeal, given by the Pennsylvania act relating to divorces *a vinculo matrimonii*, was extended by implication, to the act of 1817, respecting divorces *a mensa et thoro*. Roberts v. Roberts, 9 S. & R. 191.

So the right to appeal from justices' judgments, in cases of contracts, was held to extend to trespass, to which the powers of magistrates had been extended, without expressly giving the right of appeal. 4 S. & R. 73.

And this wise and safe rule of construction has been held to apply to statutes which have been repealed, or may not have been noticed by the statutes to be construed. Rex v. Loxdale, 1 Burr. 447.

And Lord Mansfield, in that case, said, "that where there are different statutes *in pari materia*, though made at different times, or even expired, and not referring to each other, they shall be taken and construed together, as one system." In the expressive language of Tilghman, Ch. J., of Pennsylvania, in one of the cases cited, they were so blended together as to form one statute.

And from the cases cited from Burrow, this blending of statutes, this analogy of legislation, is not confined to public statutes, but that public laws may receive aid in their construction from private laws, and *vice versa;* for his Lordship says, in the

case cited, page 448, that the act of Parliament, of 1740, relating to St. Martins, and the overseers of that parish, (which was, I apprehend, clearly a private act,) which extended the number of overseers of the poor to be appointed by two justices, under the general act of 43 Elizabeth, to the number of nine, " shows " (says the Chief Justice) " the construction put by the legislature themselves, upon the 43 Elizabeth, on this head, and excepts this very large parish of St. Martins out of it.

. I need not burden your honors with any name of books on this, so obvious a rule of construction. This case, in Burrow, was carefully considered; it had been argued several times before Ch. J. Ryder, and afterwards before Lord Mansfield, by great counsel, and if any case is entitled to respect of courts, it is a case so considered, and so decided.

- But we have cases nearer home, and more german to this very matter of private acts, in relation to these very patent-rights.

In the case of Evans *v.* Eaton, (3 Wheat. 454,) it was declared, that an act of Congress, authorizing the Secretary of State to issue a patent to Oliver Evans, for his improvements in the manufacture of flour, " was ingrafted on the general act for the promotion of useful arts, and that the patent was issued under both acts," the public and the private one.

So in the case of Evans *v.* Jordan, 9 Cranch, 199, which was an action to recover damages under the same private act, Washington, J., said, in declaring the opinion of the court, that "it should be recollected, that the right of the plaintiff to recover damages for using his improvement, after the issuing of his patent, arises, not under this law, but the general law of 1793."

. If the plaintiff is obliged to invoke the aid of the act of 1836, he must take the whole of it. It is a well-established rule of law, that he who claims the benefit of his title, must admit its disadvantages. *Qui sentit commodum sentire debet et onus.*

Mr. Chief Justice TANEY delivered the opinion of the court.

The bill in this case was filed by the appellants, on the 6th of July, 1850, in the Circuit Court of the United States, for the Western District of Pennsylvania, to obtain an injunction restraining the appellees from the use of two of Woodworth's planing machines in the city of Pittsburg. The term for which Woodworth's patent was originally granted, expired in 1842, but it was extended seven years by the board established by the 18th section of the act of 1836. And afterwards, by the act of Congress of February 26, 1845, this patent was extended for seven years more, commencing on the 27th of December, 1849, at which time the previous extension would have terminated.

. It appears, from the pleadings and evidence in the case, that

shortly after the passage of the act of Congress of 1845, William Woodworth, the administrator of the patentee, in whose name the certificate of extension was directed to be issued, assigned all his right to James G. Wilson, from whom the appellant purchased the exclusive right to construct and use this machine, and to vend to others the right to construct and use it, in a large district of country described in the grant. Pittsburg, in which the machines in question are used, is included within these limits. And the right which the appellant purchased was regularly transferred to him by Wilson, by an instrument of writing duly recorded in the Patent-Office.

In the year 1833, during the term for which the patent was originally granted, the defendants purchased the right to construct and use a certain number of these machines within the limits of the city of Pittsburg and Alleghany county; and the right to do so was regularly transferred to them by different assignments, deriving their title from the original patentee. The two machines mentioned in the bill were constructed and used by the respondents soon after the purchase was made, and the appellees continued to use them up to the time when this bill was filed. And the question is, whether their right to use them terminated with the first extension, or still continues under the extension granted by the act of 1845.

The Circuit Court decided that the right of the appellees still continued, and upon that ground dismissed the appellant's bill. And the case is now before us upon an appeal from that decree.

In determining this question we must take into consideration not only the special act under which the appellant now claims a monopoly, but also the general laws of Congress in relation to patents for useful improvements, and the special acts which have from time to time been passed in favor of the particular patentees. They are statutes in *pari materia;* and all relate to the same subject, and must be construed together. It was so held in the case of Evans *v.* Eaton, (3 Wheat. 518,) where the court said that the special act of Congress in favor of Oliver Evans, granting him a new patent for fourteen years, for his improvements in manufacturing flour and meal, was ingrafted on the general act for the promotion of useful arts, and the patent issued in pursuance of both. The rule applies with more force in the present case; for this is not the grant of a new patent, but an enlargement of the time for which a patent previously extended under the act of 1836, should continue in force.

Indeed, this rule of construction is necessary to give effect to the special act under which the appellant claims the monopoly. For this law does not define the rights or privileges which the patent shall confer, nor prescribe the remedy to which he shall

be entitled if his rights are infringed. It merely extends the duration of the patent, and nothing more. And we are necessarily referred, therefore, to the general law upon the subject to ascertain the rights to which the patent entitled him, and also the remedy which the law affords him if these rights are invaded.

Now, the act of 1836, in express terms, gives the benefit of the extension authorized by that law to the assignees and grantees of the right to use the thing patented to the extent of their respective interests therein. And under this provision it was decided, in the case of Wilson *v.* Rousseau, (4 Howard, 688,) that the party who had purchased and was using this planing machine during the original term for which the patent was granted, had a right to continue the use during the extension. And the distinction is there taken between the grant of the right to make and vend the machine, and the grant of the right to use it.

The distinction is a plain one. The franchise which the patent grants, consists altogether in the right to exclude every one from making, using, or vending the thing patented, without the permission of the patentee. This is all that he obtains by the patent. And when he sells the exclusive privilege of making or vending it for use in a particular place, the purchaser buys a portion of the franchise which the patent confers. He obtains a share in the monopoly, and that monopoly is derived from, and exercised under, the protection of the United States. And the interest he acquires, necessarily terminates at the time limited for its continuance by the law which created it. The patentee cannot sell it for a longer time. And the purchaser buys with reference to that period; the time for which exclusive privilege is to endure being one of the chief elements of its value. He therefore has no just claim to share in a further monopoly subsequently acquired by the patentee. He does not purchase or pay for it.

But the purchaser of the implement or machine for the purpose of using it in the ordinary pursuits of life, stands on different ground. In using it, he exercises no rights created by the act of Congress, nor does he derive title to it by virtue of the franchise or exclusive privilege granted to the patentee. The inventor might lawfully sell it to him, whether he had a patent or not, if no other patentee stood in his way. And when the machine passes to the hands of the purchaser, it is no longer within the limits of the monopoly. It passes outside of it, and is no longer under the protection of the act of Congress. And if his right to the implement or machine is infringed, he must seek redress in the courts of the State, according to the laws of the State, and not in the courts of the United States, nor under

the law of Congress granting the patent. The implement or machine becomes his private, individual property, not protected by the laws of the United States, but by the laws of the State in which it is situated. Contracts in relation to it are regulated by the laws of the State, and are subject to State jurisdiction. It was so decided in this court, in the case of Wilson v. Sanford and others, 10 Howard, 99. Like other individual property, it is then subject to State taxation; and from the great number of patented articles now in use, they no doubt, in some of the States, form no inconsiderable portion of its taxable property.

Moreover, the value of the implement or machine in the hands of the purchaser for use, does not in any degree depend on the time for which the exclusive privilege is granted to the patentee; nor upon the exclusion of others from its use. For example, in the various patented articles used in agriculture, in milling, in manufactures of different kinds, in steam-engines, or for household or other purposes, the value to the purchaser is not enhanced by the continuance of the monopoly. It is of no importance to him whether it endures for a year or twenty-eight years. He does not look to the duration of the exclusive privilege, but to the usefulness of the thing he buys, and the advantages he will derive from its use. He buys the article for the purpose of using it as long as it is fit for use and found to be profitable. And in the case before us the respondents derive no advantage from the extension of the patent, because the patentee may place around them as many planing machines as he pleases, so as to reduce the profits of those which they own to their just value in an open and fair competition.

It is doubtless upon these principles that the act of 1836 draws the distinction between the assignee of a share in the monopoly, and the purchase of one or more machines, to be used in the ordinary pursuits of business. And that distinction is clearly pointed out and maintained in the case of Wilson v. Rousseau, before referred to.

Upon the authority, therefore, of the cases of Evans v. Eaton, and Wilson v. Rousseau, these two propositions may be regarded as settled by judicial decision: 1. That a special act of Congress in favor of a patentee, extending the time beyond that originally limited, must be considered as ingrafted on the general law; and 2. That under the general law, in force when this special act of Congress was passed, a party who had purchased the right to use a planing machine during the period to which the patent was first limited, was entitled to continue to use it during the extension authorized by that law.

Applying these rules to the case before us, the respondents

must be entitled to continue the use of their planing machines, during the time for which the patent is extended by the special act of Congress, unless there is something in the language of the law requiring a different construction.

But there is nothing in the law to justify the distinction claimed in this respect on behalf of the patentee. Its language is plain and unambiguous. It does not even grant a new patent, as in the case of Oliver Evans. It merely extends the time of the monopoly to which the patentee was entitled under the general law of 1836. It gives no new rights or privileges, to be superadded to those he then enjoyed, except as to the time they should endure. The patent, such as it then was, is continued for seven years longer than the period before limited. And this is the whole and only provision contained in this special act. In order, therefore, to determine the rights of the patentee during the extended term, we are necessarily referred to the general law, and compelled to inquire what they were before this special act operated upon them, and continued them. Indeed, the court has been obliged to recur to the act of 1836, in every stage of this suit, to guide it in deciding upon the rights of the parties, and the mode of proceeding in which they are to be tried. It is necessarily referred to in order to determine whether the patent under which the complainant claims, was issued by lawful authority, and in the form prescribed by law; it was necessary to refer to it in the Circuit Court in order to determine whether the patentee was entitled to the patent, as the original inventor, that fact being disputed in the Circuit Court; also, for the notices to which he was entitled in the trial of that question; and for the forum in which he was authorized to sue for an infringement of his rights. And the rights of the appellant to bring the case before the court for adjudication is derived altogether from the provisions of the general law. For there is no evidence in the record to show that the machines are worth two thousand dollars, and no appeal therefore would lie from the decision of the Circuit Court, but for the special provision in relation to patent cases in the act of 1836. And while it is admitted that this special act is so ingrafted on the general law, as to entitle the patentee to all the rights and privileges which that law has provided, for the benefit and protection of inventors, it can hardly be maintained that the one in favor of the purchaser of a machine is by construction to be excepted from it, when there are no words in the special act to indicate that such was the intention of Congress.

This construction is confirmed by the various special acts which have been passed from time to time, in favor of particular inventors, granting them new patents after the first had expired

or extending the time for which they were originally granted. Many of these acts have been referred to in the argument, some of which contain express provisions, protecting the rights of the purchaser under the first term, and others contain no provision on the subject, and merely grant a new patent, or, as in the case before the court, extend the duration of the old one. And in several instances special laws in favor of different inventors have been passed within a short time of each other, in one of which the rights of the previous purchaser are expressly reserved, and in the other there is no provision on the subject. And the act of March 3, 1845, authorizing the patent of William Gale, for an improvement in the manufacture of silver spoons and forks to be extended, was passed only a few days after the act in favor of Woodworth, and Gale's patent is subjected in express terms to the conditions and restrictions in the act of 1836, and consequently protects previous purchasers from a new demand.

It has been contended, on behalf of the appellant, that the insertion of these restrictions in one special law, and the omission of them in another, shows that, in the latter, Congress did not intend to exempt the purchaser from the necessity of obtaining a new license from the patentee. And that Congress might well suppose that one inventor had stronger claims upon the public than another, and might, on that account, give him larger privileges on the renewal.

But this argument only looks to one side of the question, that is, to the interest and claims of the inventor. There is another, and numerous class of persons, who have purchased patented articles, and paid for them the full price which the patentee demanded, and we are bound to suppose that their interests and their rights would not be overlooked or disregarded by Congress. And still less, that any distinction would be drawn between those who purchased one description of patented machines and those who purchased another. For example, the act granting a new patent to Blanchard, in 1834, for cutting or turning irregular forms, saves the rights of those who had bought under the original patent. And we ought not to presume, without plain words to require it, that while Congress acknowledged the justice of such claims in the case of Blanchard, they intended to disregard them in the case of Woodworth. Nor can it be said that the policy of Congress has changed in this respect after 1834, when Blanchard's patent was renewed. For, as we have already said, the same protection is given to purchasers in the special law, authorizing the renewal of Gale's patent, which was passed a few days after the law of which we are speaking.

The fair inference from all of these special laws is this, that

Bloomer v. McQuewan et. al.

Congress has constantly recognized the rights of those who purchase for use a patented implement or machine; that in these various special laws the patentee and purchasers of different inventions were intended to be placed on the same ground; and that the relative rights of both parties under the extension, by special act of Congress, were intended to be the same as they were when the extension was granted under the general law of 1836.  It would seem that in some cases the attention of the legislature was more particularly called to the subject, and the rights of the purchaser recognized and cautiously guarded. And when the provision is omitted, the just presumption is, that Congress legislated on the principle decided by this court in Evans v. Eaton, and regarded the special law as ingrafted on the general one, and subject to all of its restrictions and provisions, except only as to the time the patent should endure. Time is the only thing upon which they legislate.  And any other construction would make the legislation of Congress, on these various special laws, inconsistent with itself, and impute to it the intention of dealing out a different measure of justice to purchasers of different kinds of implements and machines ; protecting some of them, and disregarding the equal and just claims of others.

And if such could be the interpretation of this law, the power of Congress to pass it would be open to serious objections.  For it can hardly be maintained that Congress could lawfully deprive a citizen of the use of his property after he had purchased the absolute and unlimited right from the inventor, and when that property was no longer held under the protection and control of the General Government, but under the protection of the State, and on that account subject to State taxation.

The 5th amendment to the Constitution of the United States declares, that no person shall be deprived of life, liberty, or property, without due process of law.

The right to construct and use these planing machines, had been purchased and paid for without any limitation as to the time for which they were to be used.  They were the property of the respondents.  Their only value consists in their use. And a special act of Congress, passed afterwards, depriving the appellees of the right to use them, certainly could not be regarded as due process of law.

Congress undoubtedly have power to promote the progress of science and useful arts, by securing for limited times, to authors and inventors, the exclusive right to their respective writings and discoveries.

But it does not follow that Congress may, from time to time, as often as they think proper, authorize an inventor to recall

rights which he had granted to others ; or reinvest in him rights of property which he had before conveyed for a valuable and fair consideration.

But we forbear to pursue this inquiry, because we are of opinion that this special act of Congress does not, and was not intended to interfere with rights of property before acquired ; but that it leaves them as they stood during the extension under the general law.    And in this view of the subject, the appellant was not entitled to the injunction he sought to obtain, and the Circuit Court were right in dismissing the bill.

As the decision on this point disposes of the case, it is unnecessary to examine the other grounds of defence taken by the appellees.

The decree of the Circuit Court must be affirmed.

Mr. Justice McLEAN and Mr. Justice NELSON dissented.

Mr. Justice McLEAN.

Woodworth's patent bears date the 27th of December, 1828, and runs for fourteen years.    On the 29th of July, 1830, the patentees conveyed to Isaac Collins and Barzillai C. Smith the right to construct, use, and vend to others, the planing machine invented within several States, including Pennsylvania, except the city of Philadelphia.    On the 19th of May, 1832, Collins and Smith transferred to James Barnet the right to construct and use, during the residue of the aforesaid term of fourteen years, fifty planing machines, within Pittsburg and Alleghany county, for which he agreed to pay four thousand dollars.    Barnet agreed not to construct or run more than fifty machines during the term aforesaid, and Collins and Smith bound themselves not to license during the term, nor to construct or use themselves during the term, or allow others to do so, in the limits of Pittsburg and Alleghany county.

On the 27th of December, 1842, the patent expired, but it was renewed and extended for seven years, under the act of 1836. This extension expired in 1849 ; but Congress, on the 26th of February, 1845, passed an act which provided that " the said letters-patent be, and the same is hereby, extended for the term of seven years, from and after the twenty-seventh day of December, 1849."

The patentee, by deed dated the 14th of March, 1845, and also by a further deed dated the 9th of July, 1845, conveyed to James E. Wilson all his interest as administrator in the letters patent under the extension by the act of Congress.    And Wilson, on the 4th of June, 1847, for the consideration of twenty-five thousand dollars, gave to Bloomer, the plaintiff, a license to con-

struct and use, and vend to others to construct and use, during the two extensions, "all that part of Pennsylvania lying west of the Alleghany Mountains, excepting Alleghany county, for the first extension, which expires on the 27th day of December, 1849, and the States of Virginia, Maryland, Kentucky, and Missouri, excepting certain parts of each State."

The defendants continued to run their machines during the residue of the fourteen years, for which the patent was granted, and during the first extension; and the complainant filed his bill to enjoin the defendants from running their machines under the second extension, by the act of Congress.

The contract of the defendants was entered into the 19th of May, 1831, and under it Barnet had a right "to construct and use during the residue of the aforesaid term of fourteen years, fifty planing machines," &c. The patent expired on the 27th of December, in 1842. The contract of defendants was made the 19th of May, 1832, leaving about nine years and six months for the patent to run, and this was the time limited by the contract, and for which the consideration of four thousand dollars was paid. This was not left to construction from the life of the patent, but the contract expressly declared the right was purchased "for the residue of the aforesaid term of fourteen years."

This term was enjoyed by the defendants, and under the decision of this court, in the case of Wilson v. Rousseau et al. (4 Howard, 646,) the seven years' extension under the act of 1836, was also enjoyed by the defendants. This construction of the act of 1836, in my judgment, was not authorized, and was not within the intention of the law, as was expressed at the time. That extension having expired, another extension is claimed under the act of Congress. This claim is set up to an injunction bill, filed by the complainant, who is the assignee of the patent for a part of Pennsylvania and other States. And by the decision of four of my brethren, just delivered, the defendants are to enjoy this extension, making fourteen years beyond their control. This would seem to imply, that, under the act of 1836, and under the act of 1845, the assignees were the favored objects of Congress. But this is not the case. The patentee who made the invention, and through whose ingenuity, labor, and expense, a great benefit has been conferred on the public, in justice, is entitled to remuneration, and that only was the ground of extension, whether under the law of 1836, or the special act of 1845.

This, as well as the former decision, was influenced by the consideration that the owners of the machines are, in equity, entitled to run them so long as the exclusive right of the patent

Bloomer v. McQuewan et al.

shall be continued. It is said that the machines are property, and that no act of Congress should deprive the owners of the use of their property. But in this view, the property of the patentee seems not to be taken into the account. He is the meritorious claimant for protection. The assignee for a specific time, rests upon his contract. He has conferred no benefit on society. His investment was made with an exclusive reference to his own advantage. He has no more claims upon the public sympathy than he who rents a mill, a farm, or engages in a business, open to all who expect a profit by it.

But the hardship is supposed to exist, in the fact that, to use the right, a planing machine must be constructed at an expense of some four or five hundred dollars, and this will be lost to the occupier, if by an extension he shall not be permitted to run his machine. The answer is, when he entered into the contract he knew, or is presumed to have known, that the patent might be extended under the law of 1836 or by special act, and if he desired an interest under the renewed patent, he should have provided for it in his contract. Having failed to do this, it would seem to be unjust that, under a contract to run the machine less than ten years, he should be entitled to run it sixteen years. The consideration paid was limited to the term specified in the contract. But, it is answered, that the assignee expected to run his machine after the termination of the contract on which the exclusive right would end and become vested in the public.

Let us examine this plea, and it will be found that a great fallacy prevails on this subject. A right that is common, is no more valuable to one person than another, as all may use it. The injury, then, consists, so far as the licensee is concerned, in the reduction of the value of his machine, by the extension of the exclusive right in the patentee, to the exclusion of the assignee. It is true this deprives him of the monopoly which his contract secured to him. But he has enjoyed this to the extent of his contract, and for which he has paid the stipulated consideration. Now his only equitable plea to run his machine during the renewed patent, arises alone from the supposed difference in the value of his machine, under the renewal, without a license, and where the right becomes vested in the public.

If there had been no renewal, the licensee might run his machine, and any other person might run one. It is a fact known to every observing individual, when a new business is set up, as a planing machine, supposed to be very profitable generally, a competition is excited, which reduces the profit below a reasonable compensation for the labor and expense of the business. If the monopoly continued, as enjoyed under the contract, the consideration paid for the monopoly would be added

to the profits, which would make them large. But when the monopoly ceases, the profits, if not destroyed, are reduced by competition, at least as low, if not below the ordinary profit of capital employed in other investments.

If the business of the county or city required the number of planing machines in operation, the licensee could sell his machine at a reasonable reduction for the time it had run. The machines of the defendant had run, probably, from twelve to fifteen years. A considerable reduction would be expected by the purchaser, as a machine could not be expected to last more than twenty years. But suppose it can be used thirty, then one half of the value must be deducted for the wear of the machine fifteen years, which would reduce it to some two hundred and fifty or three hundred dollars.

But suppose the exclusive right should be continued in the patentee, by an extension of it seven years. Then, if the machines were not more numerous than the public required, they would be wanted by their owners, or by others disposed to engage in the business. And I hazard nothing in saying, that, after deducting the compensation from the profits, paid for the exclusive right, they would be larger than could be hoped for, where the right was common. Under such circumstances, I can entertain no doubt, that a machine would sell for more money, under the extension of the patent, than where the right goes to the public.

The idea that to refuse the use of a machine under the extension of a patent, is an unjust interference with property, I think, is unfounded. There is no interference with the property in the machine. The owner may sell it to any one who has a license to use it. It is not the property in the machine that is complained of, but because the right to run it longer than the contract provided for, is not given. The licensee has used the franchise, as long as he purchased and paid for it; and can he in justice claim more than his contract. The extension of the right to use, while the extended patent continues, does a wrong to the patentee, by taking his property, without compensation, and giving it to the licensee. The franchise is property, and it can no more be transferred to another, without compensation or contract, than any other property. It would seem that this description of property is not governed by contract. That a contract to use the franchise ten years, does not mean what is expressed, but may mean a right for twenty years, or any other term to which the patent may be extended.

Every man who has sense enough to make a contract, takes into his estimate the contingency of a loss, to some extent, in going out of the business. He fixes his own time for the con-

47*

tract, and if he wishes to provide for the contingency arising from the renewal of a patent, he can embrace it in his contract for a stipulated compensation.

It may be true, that, unless the contrary appear, when the patentee sells a planing machine, a right to use it may be applied. But the right to construct and the right to use, are distinct. Some purchase of the patentee the right to construct the machine, others to use it. This planing machine cannot be compared to a plough, or any other article which may be considered the product of the patent. The machine is the instrument through which the plank is planed. The plank is the product, and may be sold in the market as other property. But the planing machine cannot be used, without a license. The law protects the franchise, by prohibiting the use of the machine without a license. When Barnet purchased the franchise for the fifty machines, he did not buy the machines for a term as long as the machines could run, but for nine years and six months. The contract, neither expressly nor impliedly, extended beyond that term.

In this view, I think that I am not mistaken, and if I am not, the license is not injured a dollar by the termination of his right to run his machine, as fixed in his contract. But, on whom is the injury inflicted by extending the contract of the licensee with the patentee, and that without compensation? In the present case, the patentee has been injured, by the use of the fifty machines, at least four thousand dollars, the amount agreed to be paid for the right to run them less than ten years. And must not the property of the patentee be taken into the account, as well as the imagined rights of the licensee?

The patentee is justly considered a public benefactor. He has conferred a great benefit upon the world; and he is entitled, under our laws, to at least a compensation for his expense, ingenuity, and labor.

That the patentee is the only one whose interests are regarded, as the ground of extending the patent in the act of 1836, is clear. Now, suppose the patentee has assigned the whole of the patent, without receiving such a compensation as the law authorizes; there can be no doubt he is entitled, on that ground, to a renewal of the patent; and yet, under the decision now given, his assignees would receive all the benefits of the renewal. Should not this fact cause doubts whether the rule of construction of the statute can be a sound one, which defeats its avowed object? If this be the consequence of the assignment of the entire interest by the patentee, any partial assignment must produce the same result, though to a more limited extent. A principle which will not bear this test is not sound.

· Bloomer *v.* McQuewan et al.

The act of 1845, extending this patent, annexed no conditions. The exclusive right was extended to the administrator of Woodworth for seven years, from the 27th of December, 1849. But the decision now given, in effect declares this exclusive right is not given. Indeed the object of Congress must be defeated if the machines, in operation at the time of the passage of the act, are to be continued without compensation. It is presumed there are few places where planing machines were not constructed before 1849, the time the renewal took effect, if the public required them. On this supposition, the extension of the patent can be of little or no benefit to the heirs of the patentee. Congress could have granted the act only upon the ground to remunerate the heirs of the inventor.

There seems to be a great mistake as to the profits of this patent. It was a valuable patent, but, as in all other cases, its value excited the rapacity of men who seek to enrich themselves by taking the property of others. The records of the courts show, that piracies were committed on this patent in every part of the country; and that to sustain it, much expenditure and labor have been required. It is stated that the sum of near two hundred thousand dollars has been thus expended to establish this patent. Congress have extended many patents; in some instances conditions have been imposed, in others, the franchise has been extended unconditionally. Now, where the patent is extended by act of Congress, without conditions, I am unable to perceive how the court can impose conditions. Such an act would be legislation, and not construction.

By the act of the 15th February, 1847, the patent of Thomas Blanchard, for cutting irregular forms out of wood, brass, or iron, was extended for fourteen years, from the 20th of January, 1848: " Provided that such extension shall enure to the use and benefit of the said Thomas Blanchard, his executors and administrators and to no other persons whomsoever, except that a *bonâ fide* assignee of the invention, by virtue of an assignment from the patentee heretofore made, shall have the benefit of this act, upon just, reasonable, and equitable terms, according to his interest therein. And if the said Thomas Blanchard, his executors or administrators, cannot agree with such assignee, the terms shall be ascertained and determined by the Circuit Court of the United States for the district in which such assignee resides, to be decreed upon a bill to be filed by such assignee for that purpose. And provided further, that no assignee shall have the benefit of this act unless he shall, within ninety days from its passage, agree with the said Thomas Blanchard as to the consideration upon which he is to have it, or file his bill," &c.

Every one must perceive the justice and propriety of this act; under the decision now given, the assignee of Blanchard would have had the benefit of the extension without paying for it. This act, extending Blanchard's patent, was passed two years after the decision of this court in Wil on v. Rousseau, which, under the act of 1836, gave the benefit of the extension to the assignee. This must have been known to Congress, and yet they deemed a special provision in behalf of the assignee necessary. This act, and several others of a similar character, cannot fail to convince every one that Congress did not suppose that the courts have power to annex a condition to a legislative grant.

In the case of Evans v. Jordan and Morehead, (9 Cranch, 199,) this court held, that the act of January, 1808, for the relief of Oliver Evans, does not authorize those who erected their machinery between the expiration of their old patents and the issuing of the new one, to use it after the issuing of the latter.

The above act extended the patent fourteen years, "provided that no person who may have heretofore paid the said Oliver Evans for license to use the said improvements, shall be obliged to renew said license or be subject to damages for not renewing the same; and provided also, that no person who shall have used the said improvements, or have erected the same for use, before the issuing of the said patent, shall be liable to damages therefor."

This was a much stronger case for equitable considerations than the one before us. Evans's patent had expired. His improvements were free to the public, and they were adopted by the defendants before he made application to Congress for a renewal of his patent. I will cite the reasoning of the Supreme Court on that case. "The language," they say, "of this last proviso is so precise, and so entirely free from all ambiguity, that it is difficult for any course of reasoning to shed light upon its meaning. It protects against any claim for damages which Evans might make, those who have used his improvements, or who may have erected them for use, prior to the issuing of his patent under this law. The protection is limited to acts done prior to another act thereafter to be performed, to wit, the issuing of the patent. To extend it, by construction, to acts which might be done subsequent to the issuing of the patent, would be to make, not to interpret, the law." "The injustice of denying to the defendants the use of machinery which they had erected after the expiration of Evans's first patent, and prior to the passage of this law, has been strongly urged as a reason why the words of this proviso should be so construed as to have a prospective operation. But it should be recollected that

the right of the plaintiff to recover damages for using his improvement after the issuing of his patent, under this law although it had been erected prior thereto, arises not under this law, but under the general law of the 21st of February, 1793. The provisos in this law profess to protect, against the operation of the general law, three classes of persons — those who had paid Evans for a license prior to the passage of the law; those who may have used his improvements; and those who may have erected them for use before the issuing of the patent."

And the court say, " The legislature might have proceeded still further, by providing a shield for persons standing in the situation of these defendants. It is believed that the reasonableness of such a provision could have been questioned by no one. But the legislature have not thought proper to extend the protection of these provisos beyond the issuing of the patent under that law; and this court would transgress the limits of the judicial power by an attempt to supply, by construction, this supposed, omission of the legislature. The argument founded upon the hardship of this and similar cases, would be entitled to great weight if the words of this proviso were obscure and open to construction. But considerations of this nature can never sanction a construction at variance with the manifest meaning of the legislature, expressed in plain and an unambiguous language."

The above views do not conflict with the opinion of the court in Evans *v.* Eaton, 3 Wheat. 454. In that case the court say, " Some doubts have been entertained respecting the jurisdiction of the courts of the United States, as both the plaintiff and defendants are citizens of the same State. The fifth section of the act to promote the progress of useful arts, which gives to every patentee a right to sue in a Circuit Court of the United States, in case his rights be violated, is repealed by the third section of the act of 1800, which gives the action in the Circuit Court of the United States where a patent is granted, 'pursuant' to that act, or to the act for the promotion of useful arts. This patent, it has been said, is granted, not in pursuance of either of those acts, but in pursuance of the act 'for the relief of Oliver Evans.' but this court is of opinion, that the act for the relief of Oliver Evans, is ingrafted on the general act for the promotion of useful arts, and that the patent is issued in pursuance of both. The jurisdiction of the court is therefore sustained "

There can be no question that the special law extending the grant, as to its validity, is subject to the general patent law. The right was intended to be exclusive, if it be established that Evans was the original inventor of the improvements claimed, and such improvements were stated with the necessary precision.

And also that it came under the class of cases on which suit could be brought in the courts of the United States, without regard to the citizenship of the parties. But it could not have been intended to apply to any contract subsequent to the patent, and it could only be held to embrace those general provisions of the patent law which relate to the validity of the patent. Under the act of Congress, a specification was necessarily filed, and it seems to be the practice to issue a patent under the act. This, it appears to me, is unnecessary, as the grant in the act is sufficient. But the schedule is necessary to show the nature and extent of the claim, and these must be sustained on those principles which apply to patents generally.

To give any other construction to the above remarks of the court, would be in direct contradiction to the language used, and the principle decided, in the case above cited from Cranch. In fact, the remark that the relief of Evans was ingrafted on the general law, was made in reference to the jurisdiction of the court, and cannot be extended beyond that and other questions, in relation to the validity of the patent.

This argument of the court, in Evans v. Jordan, applies with all its force and authority to the case before us; and I need only say it was the language of Marshall, of Story, of Washington, and of the other Judges of the court, except Judge Todd, who appears to have been absent. I can add nothing to the weight of the argument; but I will proceed to name the Judges of this court who have given opinions opposed to the decision of this case by four of my brethren.

Mr. Justice Wayne being sick, did not sit in the case. In Wilson v. Rousseau, he held that, under the act of 1836, the licensee had no right to run his machine under the extended patent.

Mr. Justice Curtis having, as counsel, given an opinion opposed to the right of the defendants, did not sit in the case. Mr. Justice Thompson and Mr. Justice Story had both given opinions against the right of the assignee, unless under a special assignment. This was the opinion of Mr. Justice Woodbury, as expressed in the case of Wilson v. Rousseau. Mr. Justice McKinley gave an opinion against the right of the assignee under the act of 1845, extending Woodworth's patent. The same decision has been frequently given, by the Justices of this bench, in the second and seventh circuits.

Sustained by the authority of seven Justices of this court, and by an argument of the Supreme Court, above cited, which, I think, is unanswerable, I shall deem it to be my duty to bring the same question now decided, when it shall arise in my circuit, for the consideration and decision of a full bench.

## Order.

This cause came on to be heard. on the transcript of the record from the Circuit Court of the United States for the Western District of Pennsylvania, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said Circuit Court in this cause be, and the same is hereby, affirmed, with costs.