CREAM TOP BOTTLE CORPORATION v.
BAILES, and four other cases.

Nos. 1239-N to 1242-N, 1244-N.

District Court, D. Kansas, First Division.

Nov. 30, 1931.

Ashley & Gilbert, of Kansas City, Mo., for plaintiff.

E. E. Martin and Henry E. Dean, both of Kansas City, Kan., for defendants.

POLLOCK, District Judge.

The above entitled and numbered suits are brought for the purpose of obtaining decrees enjoining defendants from infringing rights granted one Norman A. Henderson by letters patent No. 1,528,480 for milk bottles and cream separator, which said patent was duly assigned to plaintiff herein the Cream Top Bottle Corporation, the owner thereof.

On issues joined the cases were referred to an able special master, who took the proofs, considered the same, and made a voluminous report of the facts found therefrom and conclusions of law thereon, and a recommendation as to the decrees that should enter herein. Plaintiff has filed exceptions thereto which have been fully submitted on briefs and oral argument, and the matter comes now on for ruling and decrees.

By stipulation of parties, all the proofs are considered together as one case. The facts necessary to a presentation of the cases may be summarized as stated by the special master in his report, from the proofs, as follows:

Plaintiff adopted the following plan to avail itself of the benefit of its patent: It enters into contracts with manufacturers of bottles located in different sections of the country under which it gives to the manufacturer a license to manufacture the bottles under the letters patent and to sell the bottles either directly or through jobbers to certain milk dealers and distributors who may acquire the right to use the bottles from Cream Top Bottle Corporation. Beyond this the plaintiff has no interest in the manufactured product or in the proceeds of the sale, or in the manufacturing or other profits from such sales. One of such contracts is with the Thatcher Manufacturing Company of Elmira, N. Y.

The plaintiff also enters into contracts with dairymen throughout the country under which the dairymen are given the exclusive right to use the bottles and separators for the distribution of milk, with the requirement that the dairymen shall purchase their supplies of bottles from an authorized manufacturer. In consideration for their contract, the dairymen are required to pay an annual sum, or royalty, which is calculated at one cent per capita of the population in the community served. No restriction is placed upon the number of bottles which an authorized dairyman may purchase under this arrangement from the manufacturer, and the extent or volume of his purchase has no bearing upon the royalty which he is required to pay under his contract.

Such a contract was made with the Meyer Sanitary Milk Company, a corporation, engaged in wholesale and retail distribution of

milk in Kansas City, Kan. The contracts with the Thatcher Manufacturing Company and the Meyer Sanitary Milk Company are found in the proofs in this case.

"At the time of the trial, the bottles were in use in over 600 communities in the United States and their use by dairymen is extensive. Cream Top Bottle Corporation does not keep track of the volume of such sales, but, as some indication, the President of the Company testified that they have some dairymen who use from sixty to eighty carloads in each year. A carload contains from 20,-000 to 30,000 bottles. (Trans. p. 30.)

"The Meyer Sanitary Milk Company is one of the principal dairymen in Kansas City, Kansas. The Company uses in its business both the cream top bottles and other unpatented bottles of the usual pattern. It delivers to its trade from 13,000 to 18,000 bottles of milk per day of which about sixty per cent. are cream top bottles and the remainder are plain bottles. (Pages 51–59.) In the distribution of the milk there is a slight distinction made in practice with respect to the trade as testified by Mr. Meyer, President of the Company, as follows (Page 53):

" 'In supplying the wholesale trade the milk is sold at a certain price and we require a deposit of 5¢ for the bottle. In the retail trade no deposit for the bottle is required.'

" 'No charge is made for the bottle, or there is no deposit made for the bottle in selling at retail.'

"By the wholesale trade is meant stores, grocery stores, confectionery stores.

"In the sale to a wholesaler a charge ticket is prepared which contains the following notation:

" 'Total bottles—Deposit at 5¢ each. (A deposit of five cents is required for each bottle and said sum will be refunded for each bottle returned.)' (Page 54.)

"The foregoing applies to bottles of both kinds.

"In its practice the Meyer Milk Company receives from its customer, whether wholesale or retail, one empty bottle for each full bottle delivered. (Page 58.) The duty to make this exchange is imposed upon the employe of the Dairy Company who delivers the milk. If he fails to collect from the customer an empty bottle in exchange for a delivered bottle the employe is charged therefor. (Page 61.)

"No discrimination, however, is made in the exchange between cream top and ordinary bottles, that is to say, the exchange is made upon the basis of bottle for bottle rather than in kind. For example, he may deliver to a grocer a case of milk all of which is contained in cream top bottles or part in cream top bottles and the remainder in ordinary bottles. In exchange the Meyer Company will accept all cream top bottles or all ordinary bottles, or, partly one and partly the other. So likewise, a bottle of milk delivered to a family may be contained in either a cream top bottle or a plain bottle and in exchange therefor the Meyer Company will accept either cream top bottles or plain bottles irrespective of the container in which the particular delivery of milk is made.

"As a result of this practice of the Meyer Sanitary Milk Company a considerable volume of cream top bottles find their way into the channels of trade in the community for which the Meyer Company has received full satisfaction in exchange for other bottles (or in some instances has been paid five cents per bottle in cash) and to which cream top bottles, therefore, the Meyer Company has no further right or interest.

"The other dairymen who are defendants in this case are also engaged in distribution of milk, both wholesale and retail, in the territory covered by the Meyer Company and in competition with each other and with the Meyer Company. Meyer and others of them frequently have the same customers in the wholesale trade and, of course, there is more or less change by domestic or retail users from one dairyman to another.

"The defendant dairymen follow the identical practice of Meyer in distribution of milk. They receive in exchange an empty bottle for a delivered bottle and regardless of whether the delivered or the exchanged bottle is a cream top bottle or a plain and ordinary bottle. Under this method of distribution, therefore, it may well happen that the Meyer Company has received in exchange for a cream top bottle originally supplied by it to a customer a plain or ordinary bottle originally supplied to the same customer by one of the defendants.

"The testimony shows that this practice of delivery and exchange of bottles has become so well settled in the community that each dairyman, perforce, must adopt it. His only alternative being either to present the customers with a bottle at each delivery of milk without receiving a bottle in exchange or, to refuse the exchange offered and at-

tempt to charge the customer five cents for each bottle delivered in addition to the cost of the milk. Neither alternative would be practicable because, in the first alternative, he could not afford the constant drain of delivering bottles for nothing in exchange and, in the second alternative, he could not expect to keep his customer. This situation is as true where the customer has for exchange cream top bottles as in other cases.

"There is stamped in the cream top bottles the following: 'Cream top Pat. Mar. 3, 25.' These were imbedded in the glass during the process of manufacture. Other than the foregoing, nothing accompanies the bottle relating to the patent or its use.

"Following the practice of Meyer and the defendants in respect to the use and exchange of bottles, Meyer complained of the alleged improper use of cream top bottles by the defendant dairymen and declined to make any further royalty payments on his contract with the plaintiff and has made no further payments since the initial payment of $1000 at the time the contract was executed in 1928 (p. 25). However, plaintiff has permitted it to continue to purchase its supply of cream top bottles from Thatcher Company.

"The use of Cream Top Bottles by the various defendants. Defendant Bailes, Case No. 1239-N; defendant H. K. Buehler Case No. 1240-N; Defendant R. M. Sebree doing business as Crescent Dairy, Case No. 1242-N; and defendant J. P. Vochatzer Case No. 1244-N.

"The above named defendants have used and are continuing to use the bottles as containers for sweet milk.

"Defendant J. L. Bridges, Case No. 1241-N; The defendant in this last case used and is using the bottles as containers for butter milk only."

The able special master made no findings of fact or conclusions in his report touching upon the question of the validity of the patent, but for the purpose of decision assumed the patent under which plaintiff brings these suits to be a valid grant.

The theory of the plaintiff as embodied in the pleadings upon which the cases proceeded at the trial concerned itself alone with the right of the plaintiff in the manner of their conduct in supplying their customers with milk, and private milk customers. It was the conclusion of the special master from the manner in which the plaintiff conducted its business, defendants, who had no contract rights with the plaintiff in any manner after they had acquired the bottles from the Meyer Sanitary Milk Company or the manner in which they did acquire the same, would use the bottles in distributing milk to their private consumers of milk, as they did, without control by the plaintiff; that is to say, after plaintiff had granted to the Thatcher Company the right to manufacture the bottles under the patent and to sell the same in any quantity they could to the Meyer Sanitary Milk Company, and pass absolute title and full possession of the same to the Meyer Sanitary Milk Company, and that company had purchased and made full payment for the same, as the only restriction placed on the manufacturing company as to the sale of same was by private contract, that the purchaser should be conducting a milk business approved by plaintiff, and by another private contract with the Meyer Sanitary Milk Company that it would pay a royalty of $1,000 per year, or on a basis of the population to which they furnished milk, plaintiff could not restrain the use of the bottles so furnished by the Thatcher company in the hands of the customers of the milk company.

The cases which plaintiff contend are applicable to this state of facts is the case of United States v. Gen. Elec. Co., 272 U. S. 476, 47 S. Ct. 192, 196, 71 L. Ed. 362, and the District Court case of Skee Ball Co. v. Cohen, 286 F. 275, 277. I have read and considered, not alone these cases, but also the briefs and arguments advanced by counsel, and am of the opinion there is no well-considered case which goes to the extent of holding it to be within the power of the patentee to control a patented article obtained as were the bottles in dispute in these cases, after full title acquired, in the manner the bottles came into the hands of defendants as shown by this record. The case of United States v. General Electric Co., and two other companies, above cited, was a suit by the government to enjoin defendants from alleged violation of the provisions of the Sherman Anti-Trust Act (15 USCA §§ 1–7, 15) by the manner in which they marketed electric light bulbs under patents granted to the General Electric Company. It was held in that case, a patent being in itself a grant of a monopoly by the government, the patentee could exercise many rights in the manner of distributing the patented article to the trade which could not be said to violate the Sherman Anti-Trust law. Hence the claim of the government the defendants are violating the Sherman Anti-Trust Act was denied. But I conceive many things might

be said to justify the conduct of defendants in that suit in a criminal prosecution that do not justify plaintiff in an attempt to execute its trade monopoly in these cases. The Skee Ball Case above cited is more nearly akin to the facts of these cases. In that case a game of skill was purchased from the patentee of the game to be publicly operated for profit in a certain restricted territory fully described in the license granted. Having so purchased the game, he sold and transferred his rights secured under his restricted license to defendant who moved his game from Atlantic City and set it up as a public game for profit at Rockaway, a place not within the restricted territory granted to his vendor, but a place licensed to another licensee of the game from the patentee, and in competition with such other licensee of the territory at Rockaway. While the court cites with approval the general rule, in the opinion it is said: "It has been held that the sale of articles covered by a patent cannot be restricted after their unlimited conveyance, and after passing of title thereto with full right to use the article, even when the restriction is plainly stamped or set forth upon the article, so as to give warning to the purchaser, where the purpose of the restriction is to indirectly compel the purchase of other unpatented articles. Motion Picture Co. v. Universal Film Co., 243 U. S. 502, 37 S. Ct. 416, 61 L. Ed. 871, L. R. A. 1917E, 1187, Ann. Cas. 1918A, 959. Nor can price restriction be reserved after full sale of the patented article. Boston Store v. American Graphophone Co., 246 U. S. 8, 38 S. Ct. 257, 62 L. Ed. 551, Ann. Cas. 1918C, 447; Straus v. Victor Talking Mach. Co., 243 U. S. 490, 37 S. Ct. 412, 61 L. Ed. 866, L. R. A. 1917E, 1196, Ann. Cas. 1918A, 955. Such restriction is in violation of the Anti-Trust Act (Comp. St. § 8820 et seq. [15 USCA §§ 1-7, 15]). Victor Talking Mach. Co. v. Kemeny (C. C. A.) 271 F. 810."

In United States v. Gen. Elec. Co., supra, it is said: "It is well settled, as already said, that where a patentee makes the patented article, and sells it, he can exercise no future control over what the purchaser may wish to do with the article after his purchase. It has passed beyond the scope of the patentee's rights. Adams v. Burks, 17 Wall. 453, 21 L. Ed. 700; Bloomer v. McQuewan, 14 How. 539, 14 L. Ed. 532; Mitchell v. Hawley, 16 Wall. 544, 21 L. Ed. 322; Hobbie v. Jennison, 149 U. S. 355, 13 S. Ct. 879, 37 L. Ed. 766; Keeler v. Stand-

ard Folding Bed. Co., 157 U. S. 659, 15 S. Ct. 738, 39 L. Ed. 848."

Having gone carefully over the facts of this case as shown from the proofs in the record, and the law as declared by the many decisions controlling here, I conclude the findings and conclusions of the master are just, true, and correct. And, further, if any loss of trade or business comes to the plaintiff from the manner in which the Cream Top Bottles are made, sold, and used by defendants in the business of supplying milk to their private customers, such loss of trade or business arises solely and alone from the manner in which the plaintiff attempts to carry on its business in controlling the bottles manufactured under its patent beyond its power to control the same. To my mind, it would be quite simple and easy to so change its method of doing business as to retain to itself the full protection of the rights conferred upon it by its patent, and without injury to others.

It follows, the exceptions to the report of the special master must be overruled and denied, and decrees entered in accordance with his report, in which decrees a reasonable compensation to the master for his services will be made.

It is so ordered.