FIRE EXTINGUISHER MANUF'G Co. v. GRAHAM, Adm'r.   (In Equity.)

GRAHAM, Adm'r, v. FIRE EXTINGUISHER MANUF'G Co.   (Cross-bill.)

*(Circuit Court, W. D. Virginia. May 9, 1883.)*

1. PATENT—SPECIAL ACT GRANTING PATENT TO HEIRS—EFFECT OF ASSIGNMENT BY INVENTOR.

Where an inventor makes an assignment of a part interest in his invention to another, and, both he and his assignee having lost all right to a patent for such invention, by operation of law and by laches, congress subsequently passes a special act, which relieves the heirs of such inventor of the disabilities existing, and preventing them from renewing and reviving an application by the administrator for a patent; authorizes the administrator to renew the application; empowers the commissioner of patents to grant and issue letters patent for the invention; directs that the patent when issued shall have the same force and effect as though no delay had occurred in granting it; requires that the invention should have been new and useful at the time of the original application; and saves to all persons having machines containing said invention in use at the time of the issuing of the patent the right to continue the use of them without charge or molestation, but *says nothing of the rights of assignees of the invention,*—the title of the heirs to the patent granted by such act is in the nature of a title by purchase, and is not affected by the assignment.

2. SAME—SPECIAL LAW EXTENDING PATENT—EFFECT OF.

A special law extending a patent is ingrafted on the general law, not for the purpose of changing the rights intended by congress to be conferred by it, or of enlarging or restricting its purport, but only for the purpose of subjecting those rights to the principles of the general law relating to the validity of patents, and to the jurisdiction and practice of courts administering those rights.

Dr. William A. Graham, who died in 1857, was the inventor or discoverer of a method of extinguishing fires by means of throwing upon burning substances a stream of liquid combined of carbonic acid gas and water, highly condensed. He made reapplication for a patent for this discovery at the patent-office of the United States, in Washington, in November, 1837. His invention is now conceded to have been original, novel, and valuable. His application was examined and was refused on the twenty-fifth of November, 1837. It was reexamined, at his solicitation, and a second time refused, on the sixteenth of December, 1837. He then made out a new and more formal specification, which he filed on the twenty-ninth of December, 1837, in which he claimed the invention, not only of the liquid he described, but also of the apparatus by which to apply it to the extinguishing of fires. This second renewal and amended form of the application was not acted upon at the time, or for 14 years afterwards, by the commissioner of patents, action having been suspended at the request

of Dr. Graham, made in writing on the thirteenth of July, 1838. It seems that sickness and want of means compelled him to leave Washington in January, 1837, and that an accident and poverty prevented his return there until 1851. On the thirteenth of December, 1851, he renewed his application by letter. In reply he was again informed by letters of the department dated on the twenty-third of December, 1851, and on the nineteenth of January, 1852, that his application could not be reconsidered or acted upon. On the thirteenth of January, 1852, he had executed to Augustus W. Burton an assignment, by which, referring to his " new " and useful improvement in extinguishing fires, for which he had "made application for letters patent of the United States, [he] assigned to Burton one quarter of the full and exclusive right to all the improvements made by [him] as fully set forth and described in the specifications which [he] had prepared and executed preparatory to obtaining letters patent therefor; to be held and enjoyed by the said Augustus W. Burton, etc., to the full end of the term for which said letters patent are or may be granted." Both Burton and Dr. Graham were residents, at the time, of North Carolina, and this assignment was executed at Washington, where they both were, for the purpose of obtaining this patent. Dr. Graham was a native of Virginia, but lived for many years and died in North Carolina. Both Dr. Graham and Burton seemed to have regarded and accepted as final the letter of the department dated the nineteenth of January, 1852, before alluded to, refusing to reconsider the application for the patent which had been pending or suspended since December 23, 1837. There is no evidence that either of them took another step in furtherance of the application. The assignment of a part interest by Graham to Burton was made to obtain the means of defraying the expenses of this visit to Washington, and of prosecuting the application. There can be no doubt that the assignment of Graham was intended to transfer a fourth interest to Burton of this identical invention, for which he then had an application before the department, and which was finally rejected six days after the date of the assignment. During the years 1851 and 1852, and, probably, during the whole or greater part of the period which had intervened since 1837, it was a rule of practice in the department of the commissioner of patents to hold that, after a second rejection, a case was not entitled to any further examination, unless under peculiar circumstances. It was also the practice of the department during the same period to hold that no deliberate decision by one commissioner of patents should be revised by a subsequent one. See

Patent-office Report for 1851–2, House Doc. 65, 32d Congress, 2d Sess. p. 456.

The several laws limiting the time for applying or renewing applications for patents affecting the case at bar are as follows:

Section 12 of the patent laws of 1861, (12 St. at Large, 248,) among other things, provided " that all applications for patents shall be completed and prepared for examination within two years of the filing the petition; and, in default thereof, they shall be regarded as abandoned by the parties thereto, unless it be shown to the satisfaction of the commissioner of patents that such delay was unavoidable; and all applications now pending shall be treated as if filed after the passage of this act."

In the patent laws of July 8, 1870, (16 St. at Large, 202,) this section 12 of the law of 1861 is repeated by section 32, except that the later law left no discretion to the commissioner to reinstate a lapsed application. And section 35 of the law of 1870, (Id. 202,) provided that—

" Where an application for a patent has been rejected or withdrawn prior to the passage of this act, the applicant shall have six months from the date of such passage to renew his application, or to file a new one, and if he omits to do either, his application shall be held to have been abandoned. Upon the hearing of such new application, abandonment shall be considered as a question of fact."

This act of congress, and of course this section of it, were in force until the passage of the Revised Statutes of the United States the twentieth of June, 1874. No advantage of the six-months' provision of the law of 1870 was taken by Graham, who was dead, nor by Graham's administrator, under section 34 of the act of 1870, now section 4896 of the Revised Statutes, nor by Burton, who lived until 1877, nor by any one for either of them, to revive the application for the extinguisher which had been finally rejected on the nineteenth of January, 1852.

The Revised Statutes, in section 4894, in force since 1874, provide that "all applications for patents shall be completed and prepared for examination within two years after the filing of the application, and in default thereof, or upon failure of applicant to prosecute the same within two years after any action therein, of which notice shall have been given to the applicant, they shall be regarded as abandoned by the parties thereto, unless it be shown to the satisfaction of the commissioner of patents that such delay was unavoidable;" a pro-

vision which substantially revived the like one in the law of 1861, *supra*.

No one of these saving clauses was ever availed of by Dr. Graham, who died in 1857, or by Burton, who lived until 1877, or by any one for them. Burton had power to act in his own interest as fully as Dr. Graham; for section 4898 of the Revised Statutes, repeating section 11 of the patent law of 1836 and section 36 of the law of 1870, provides that "every patent or any interest therein shall be assignable *in law* by an instrument in writing;" a provision which has been frequently held to apply to inventions for which patents have not yet issued. And section 4895, repeating section 6 of the patent law of March 3, 1837, (5 St. at Large, 193,) provides that patents may be granted and issued or reissued to the assignee of the inventor or discoverer. No steps whatever seem to have been taken by Burton to secure the benefit of his assignment from Dr. Graham of a fourth interest, by following up and prosecuting their application for letters patent for the Graham extinguisher.

It is the policy of congress, after the death of inventors and original owners of patent-rights, to secure the benefits of them to heirs or devisees rather than to personal distributees. These rights are expressly vested by law in personal representatives *in trust* for heirs or devisees; and patent-rights are thus made to partake somewhat of the character of real estate. Section 10 of the patent act of 1836, section 34 of the act of 1870, and section 4896 of the Revised Statutes, provide that "when any person having made any new invention or discovery for which a patent might have been granted, dies before a patent is granted, the right of applying for and obtaining the patent shall devolve on his executor or administrator, *in trust* for the heirs at law of the deceased, in case he shall have died intestate; or, if he shall have left a will disposing of the same, then in trust for his devisee."

Notwithstanding the summary rejection of the application of Dr. Graham twice in 1837, and twice again in 1851 and 1852, the commissioner of patents awarded to W. H. Phillips, an English subject, in 1860, a patent for a similar invention. In 1869 this officer granted a patent to Carlier & Vignon, of Paris, France, a patent for an extinguisher almost if not quite identical with that refused to Dr. Graham in 1837 and in 1851. Also, in June, 1871, a patent for an extinguisher which would probably be an infringement upon Graham's, was granted to David M. Ford of Chicago, Illinois.

As before stated, Dr. William A. Graham died in 1857. He was unmarried and left no descendants. His brother, Dr. Archibald Graham of Lexington, Rockbridge county, Virginia, qualified as his administrator, before the proper court of Rockbridge county, on the second of January, 1872.

In 1877 Dr. Archibald Graham went before congress in behalf of the heirs of William A. Graham, of whom he was one, seeking to obtain a reparation of the injustice which his brother had sustained from the action of the commissioner of patents. By an act approved June 11, 1878, congress, as if desiring to requite in some degree this injustice to a meritorious and original American inventor, and to vindicate the claims of this country to a valuable discovery which stood accredited by the American patent-office to France, provided "that the heirs of William A. Graham be relieved of and from all disabilities now existing and preventing them from renewing an application by the administrator of the estate of said William A. Graham, deceased, for a patent for a novel method of extinguishing fires; that the said administrator be authorized to renew said application, conforming the same to present rules; and that the commissioner of patents be authorized to grant and issue letters patent for the invention or inventions set forth in such application; said patent, when issued, to have the same force and effect from and after the date as though no delay had occurred in prosecuting said application, or in granting a patent therefor: provided, etc., that all persons or parties having machines containing said invention, or any part thereof, in use at the time of such patent, shall have the right to continue the use thereof without charge or molestation," etc.

In pursuance of this act, a patent was issued to the administrator of William A. Graham, numbered 205,942, and bearing date the ninth of July, 1878. On the thirty-first of July, 1878, Dr. Archibald Graham, the administrator, entered simultaneously, and with the knowledge and consent of all the several contracting parties, into seven several contracts of license, respectively with (1) Charles T. Holloway of Baltimore; (2) William K. Platt of Philadelphia; (3) the North American Fire Annihilator Company of Philadelphia; (4) Sterling F. Hayward of New York; (5) the Protective Fire Annihilator Company of New York; (6) the Babcock Manufacturing Company of Chicago; and (7) the New England Manufacturing Company of Northampton, Massachusetts,—by which a license was granted to each of these several licensees to manufacture, use, and vend to others to be used, apparatus and machines contained wholly or in part the inven-

tion and improvements described in said letters numbered 205,942.

The administrator stipulated that these seven licenses were all that should be granted except by the written consent of the respective licensees; that the patent should not be sold, but should remain as the property of the grantor, and that the administrator and proprietor should not engage in the manufacture of machines. On the part of the licensees it was severally agreed that each would respect the rights of all persons holding under either of them; that neither of them would assign or sell his license to any person not of the seven without the consent of all the other licensees; that such a sale would forfeit the license held by such licensee; that in case any one of the seven licenses should be declared forfeited no other license should issue in lieu of it; and that all machines of the capacity of 18 gallons and upwards should be classed as tanks, and all below as portable machines. It was also stipulated by each licensee, in paragraphs numbered as about to be indicated,—

(1) That each licensee should pay as a royalty $10 dollars for every tank and $1 for every portable machine manufactured.

(3) That on the first day of October, January, April, and July of every year a sworn statement should be forwarded to the administrator, by each licensee, of all machines of each class made in the preceding quarter of the year; and that on or before the tenth day of the said respective months, each licensee should pay to the administrator the amount due him as royalties.

(4) That each licensee should keep in a separate book or books an accurate account of the machines made by him, which should at all times be open to the administrator; and

(7) That the administrator should have a right to forfeit and annul any license upon any failure to comply with clauses first, third, or fourth of the license contract, and for any failure to manufacture or sell machines for six consecutive months.

The present suit is brought by the Fire Extinguisher Manufacturing Company of New York. It is successor to the Babcock Manufacturing Company of Chicago, which before its contract with Graham's administratrator had been operating under the patent of Carlier & Vignon, which the courts had declared void. This Fire Extinguisher Company was only in this way one of the seven original licensees who received grants from the administrator. It had also, at some time or times previously to the institution of this suit, by purchase or contract, absorbed the rights or control of all the licenses except that of Charles T. Holloway. Though it professes to represent here only the licenses to (5) the Protective Company, (7) the New England Company, and (3) the North American Company, yet the evidence

shows that it really represents, as before stated, all the original licensees from Graham's administrator except Charles T. Holloway. It may be added, without setting out the evidence of the fact in detail, that all the licenses have, technically considered, been forfeited except that of Holloway; and that, with the same exception, all have been declared forfeited and null by the administrator of Graham.

The complainant company, on the twenty-seventh day of January, 1879, purchased of Julia L. Burton, widow and administratrix of Augustus W. Burton, all of her deceased husband's interest in the one-quarter part of William A. Graham's invention derived through said Graham's assignment to Burton of the thirteenth of January, 1852, before mentioned. The consideration nominally agreed to be paid for this interest was $30,000, some two-thirds of which was to be taken in the shares of the capital stock of the company at their par value, and the rest in cash.

The delinquencies of the licensees in making reports to the administrator, and in paying the royalty due to him, and in manufacturing machines as stipulated, is excused by the complainant on the ground of the discovery of the Burton assignment, and of the cloud upon the patent thus arising. Dr. Archibald Graham died in August, 1880, and his son Dr. John A. Graham, of Lexington, Virginia, qualified in his stead as administrator *de bonis non* of William A. Graham. There is no evidence in the case to show that either of the administrators, or the heirs, had any cognizance of the assignment of any interest to Burton until it was brought to light, as late as 1879,—not by Mrs. Burton herself, but by one J. Elliot Condict, a person connected with patents and with patent practice, and who seems to have been active and industrious in searching for and making available the Burton assignment. It appears from the evidence that the interest of Mrs. Burton is now owned by the complainant in this cause, by assignment bearing date the twenty-seventh day of January, 1879.

The bill of complaint does not charge Graham's administrator with any breach of contract, except so far as the existence of the Burton assignment constitutes one. Among other things it prays for compensation for the damages resulting to complainant from the defect in title of the grantor of the license, by reason of the grantor having owned only three-fourths of the interest in the patent granted; another fourth being owned by the representative of A. W. Burton's estate, complainant having been obliged to purchase that fourth at the price of $30,000. The bill further prays for a reference to a master, and for an account of the royalty due the administrator on

one side, and the compensation due to the complainant as aforesaid on the other. It also prays for proper injunctions, and that the forfeitures and annulments of licenses which had been declared by the administrator shall be set aside. The cross-bill of the administrator prays that the six licenses heretofore mentioned may be declared forfeit and null; that the assignment of Julia L. Burton, administratrix, to the complainant, of the fourth interest in the invention may be decreed of no effect, null, and void, and for proper accounts and injunctions.

HUGHES, J. The controlling question in this case is whether the present owners of the interest of Augustus W. Burton in the Graham invention derived any benefit from the special act of congress of June 11, 1878, authorizing the granting of letters patent for the invention. If that act inured exclusively to the benefit of the heirs of the inventor, then the complainant here has lost its legal rights. It has lost them because those whom it represents did not comply with the stipulations of their several licenses as to making quarterly reports, paying up royalties due quarterly to the administrator, and continuing to manufacture machines without interruption for any six consecutive months; and their licenses are legally forfeited because of this non-compliance with express stipulations. If, on the other hand, that act inured to the benefit of the owners of the Burton fourth interest, then it would seem that, by reason of the cloud resting upon the Graham title, the licensees were not bound to proceed with the execution of their respective contracts until it was cleared up; and a court of equity may relieve them from the legal effects of their inaction. Thus the case rests upon the effect to be given to the special act of June 11, 1878.

A number of decisions of the supreme court of the United States have been cited in behalf of complainant in an argument to show that this act did inure to the benefit of the holders of the Burton assignment as effectually as to that of the heirs. These cases are of two classes,—one class relating to the effect of extensions of patents beyond the original periods for which they are issued, upon the rights of owners of *machines* held and used under original patents; and the other class relating to their effect upon the rights of persons who have received assignments of *patents* themselves, or of inventions for which applications for patents are to be made or are pending. For reasons which need no explanation, congress has been liberal and careful in protecting the rights of persons using patented machines after the expiration of the original terms of patents. For example,

section 18 of the patent law of 1836, after providing that patents extended 7 years after their original term of 14 years had expired, should have the same effect in law as though originally granted for 21 years; also provided that "the benefit of such renewal shall extend to assignees and grantees of the right *to use the thing patented*, to the extent of their respective interest therein." This clause saved the right of men of business practically operating machines to continue to use them during the extended term of the patent. The effect of this clause underwent careful scrutiny by the supreme court in the case of *Wilson* v. *Rousseau*, 4 How. 646, 673, *et seq.* The decision there distinctly discriminates between persons engaged in the practical use of machines and speculators in patents and inventions.

It was so held to do in the later case of *Bloomer* v. *McQuewan*, 14 How. 539, where the supreme court, Chief Justice TANEY delivering the opinion, said:

"The act of 1836 in express terms gives the benefit of the extension authorized by that law to the assignees and grantees of the right to *use the thing patented* to the extent of their respective interests therein. And under this provision it was decided in *Wilson* v. *Rousseau* that 'the party who had purchased and was using this planing machine during the original term for which the patent was granted, had a right to continue to use it during the extension. And the distinction is there taken between the grant of the right *to make and vend* the machine, and the grant of the right *to use it.*"

At page 550 of the report the court adds:

" The act of 1836 draws the distinction between the assignee of a share in the monopoly, and the purchaser of one or more machines, to be used in the ordinary pursuits of business. And that distinction is clearly pointed out and maintained in the case of *Wilson* v. *Rousseau.*"

See, also, *Gibson* v. *Gifford*, 1 Blatchf. 531.

It is true that in this case, while thus emphasizing the distinction between the rights of dealers in patents and the rights of business men using machines, the distinct decision of the supreme court was that the owner of a patented machine obtained during the original term of a patent had the right to continue to use it during the extended term renewed by special act, if the act embodied no language forbidding it, although the act should not contain a special grant of the right. But it is also true that the case goes no further. It relates to the use of patented machines, and did not relate to patents or inventions. It decided no more than that the owners of machines had a right to use them during terms extended by special acts; and decided nothing in respect to purchasers of inchoate inventions, and dealers in patent rights. The court was careful to distinguish be-

tween these two classes of persons, widely different in their claims upon the protection of courts. The supreme court of the United States has often found itself constrained to embark in judicial legislation. In the case of *Bloomer* v. *McQuewan* it legislated to the extent of giving to section 18 of the patent law of 1836, a meaning beyond its terms, against the remonstrance of Mr. Justice McLEAN and Mr. Justice NELSON. But because it did this in favor of practical men actually using machines, *non constat* that it would do so in favor of purchasers of patents and dealers in other men's inventions. ·

This case of *Bloomer* v. *McQuewan*, and all anterior cases cited on behalf of the complainant at bar, refer only to the operators and owners of machines. They do not relate to the class of persons who deal in other men's patent rights; and I will pass on to the other class of cases. Before doing so, however, I will refer to a general ruling of the supreme court on this subject of special acts granting extensions of patents.

In *Evans* v. *Eaton*, 3 Wheat. 518, it was remarked by the court that these special acts "must be considered as ingrafted on the general patent law," and this remark of the court in that case was adopted as a ruling in *Bloomer* v. *McQuewan*. The full purport of the remark was expounded in the latter case by Mr. Justice McLEAN in his dissenting opinion, who said: "The remark that the [special] act for the relief of Evans was ingrafted on the general law, was made in reference to *the jurisdiction of the court* and cannot be extended beyond that, and other questions in relation to *the validity of the patent*." This is all that the court meant in its original remark and in its subsequent ruling. If more was meant, then the Burton assignment is at an end; for section 4895 of the Revised Statutes, repeating the provisions of preceding acts, provides that on the death of an inventor before a patent is granted, without a will, the patent shall go to his heirs. But no more was meant; for in *Bloomer* v. *McQuewan* the explanation made by Mr. Justice McLEAN was illustrated more at large by Chief Justice TANEY in delivering the opinion of the court, who said:

"The court has been obliged to recur to the act of 1836, [then the general patent law in force,] in every stage of this suit, to guide it in deciding upon the rights of the parties and the mode of proceeding in which they are to be tried. It is necessarily referred to in order to determine whether the patent, under which the complainants claim, was issued by lawful authority, and in the form prescribed by law; it was necessary to refer to it in the circuit court in order to determine whether the patentee was entitled to the patent as the original inventor, that fact being disputed in the circuit court; also, for

the notices to which he was entitled in the trial of that question, and for the forum in which he was authorized to sue for an infringement of his rights. And the right of the appellant to bring the case before this court for adjudication is derived altogether from the provisions of the general law; for there is no evidence in the record to show that the machines are worth $2,000, and no appeal therefor would lie from the decision of the circuit court, but for the special provisions in relation to patent cases in the act of 1836."

Thus it is plain that a special law extending a patent is "ingrafted" on the general law, not for the purpose of changing the rights intended by congress to be conferred by it, or of enlarging or restricting its purport, but only for the purpose of subjecting those rights to the principles of the general law relating to the validity of patents, and to the jurisdiction and practice of the courts administering those rights. Leaving behind, therefore, as irrelevant to our present inquiry, the case of *Bloomer* v. *McQuewan,* and all anterior decisions of the supreme court which, like it, relate only to *the use of patented machines* during terms extended by general or special laws, I come to consider cases which relate to assignments of patents or of inventions for which patents are expected to be obtained.

It is apparent to me, from the evidence in the case before us, that the assignment of Graham, the inventor, to Burton, of a one-fourth interest in the invention for which they were applying for a patent, was intended to refer to the fire-extinguishing process and apparatus for which congress afterwards authorized a patent to be issued to Graham's heirs; and I am sure that if Graham had himself succeeded in obtaining a patent for this invention, under the general patent laws in force, Burton would have had, under his assignment, a valid title to a one-fourth interest in it. I am unwilling to split hairs on the subject of the identity of the invention contemplated by Graham's assignment, thirteenth of January, 1852, with the invention patented under the special act of June 11, 1878, or on the subject of the validity of the assignment to convey to Burton a valid fourth interest in that identical invention, if it had been issued in pursuance of any law, general or special, to Graham himself, or to his administrator for the estate. I think this is the clear, unequivocal, and emphatic teaching of the cases about to be reviewed.

In *Gaylor* v. *Wilder,* 10 How. 494, it was decided that an assignment of a patent-right, made and recorded in the patent-office before the patent issued, which purported to convey to the assignee all the inchoate right which the assignor then possessed, as well as the legal title which he was about to obtain, was sufficient to transfer the

right to the assignee, although a patent afterwards issued to the assignor. The decision on this point·was based upon section 11 of the act of 1836, and is now familiar law. The case decides nothing more, so far as concerns the case at bar, than that an invention may be assigned before a patent issues, and that such an assignment carries to the assignee all the right which the inventor has and intends to assign. It does not touch the question whether, when the inventor and his assignee lose all right to a patent, another who obtains a right to it by special act is bound by the assignment.

In *Railroad Co.* v. *Trimble*, 10 Wall. 367, one Howe had assigned "all the right, title, and interest which he had in an invention, and which might be secured to him from time to time, the same to be held by his assignee for his own use and for that of his legal representatives, to the full end of the term for which letters patent are or may be granted." Howe had then obtained two patents, and afterwards died. No special act of congress had been passed for his benefit, or that of his administrator or heirs; and the rights of his assignee depended upon the provisions of the general patent law. The question was whether Howe had, by such an assignment, granted all his rights to the patents issued to himself when alive, after the date of assignment. The general patent law of 1836, then in force, provided, in section 11, that every patent should be assignable in law, either as to the whole interest or any undivided part. The court held that this assignment carried the entire invention, and all alterations and improvements, and all patents, whensoever issued, and all extensions of the patent; and that an assignment of the extension of a patent before the extension issued, carried the extended patent, if words proper to embrace the right under the extension were used. Here there was no special act; but if there had been one in favor of the inventor himself, and a patent had issued to him for a second extension of his patent, I think it would be idle to contend that the court would not have held that the assignment in this case would have embraced the extension under the special act.

In the case of the *Nicolson Pavement Co.* v. *Jenkins*, 14 Wall. 452, there was an assignment of an extended patent, the original one for 14 years having expired. The patentee had granted all the right, title, and interest which he had in the invention and letters patent; the same to be held and enjoyed by the assignee, for the use and behoof òf·himself and his legal representatives, to the full end of the term for which the said letters patent are or may be granted, as fully and

effectually as the same would have been held and enjoyed by the patentee had the assignment never been made. Here an original patent had already been obtained by the assignor. He had afterwards obtained a reissue on an amended specification. He had then made the assignment in the terms which have been stated. He had afterwards obtained still another reissue on still other amended specifications; and had then died. There had afterwards been obtained by his administrator, under the eighteenth section of the general patent law of 1836, an extended patent for seven years. No third-term extension had been obtained under any special act. The question was whether the assignment carried the seven-years' extended patent thus obtained by his administrator, and the court held that it did. So, I doubt not, it would also have held if there had been an extension for a third term by special act passed in favor of the inventor himself, or of his administrator as his personal representative.

In *Hendrie* v. *Sayles*, 98 U. S. 546, an assignment had been made by an inventor of an invention not yet patented, and afterwards a 14-years' patent been issued to the assignee in pursuance of section 11 of the patent law of 1836; and the right of the assignee to a renewed seven-years' patent under the general law was the question in dispute. The court held that a renewed patent might be issued to the assignee; considering that the language of the assignment had been broad enough to cover the extended term. Here the inventor had assigned all the right, title, and interest which he now had, or by letters patent would be entitled to have and possess, as described in the specification prepared and executed by him, or to be prepared and executed by him, for obtaining letters patent; the whole to be enjoyed and held by the assignee and his legal representatives, to the full extent and manner in which the same would have been or could be held and enjoyed by the inventor had this assignment never been made. I am of opinion that in this case also, if there had been a special act granting a third-term extension of this patent in favor of the inventor himself, the court, under the broad and comprehensive language of the assignment, would have held that the assignment carried the third-term patent, unless the special act contained words expressly or impliedly negativing such an implication.

In the light of these decisions we come now to consider the case at bar. Here we have nothing to do with the use of patented machines after the term of the patents have expired; and so the first class of cases which have been examined have little, if any, relevancy to the

questions we are to deal with. Nor do the second class of cases which have been considered bear especially upon the case at bar. Those were cases in which the effect of assignments of inventions before the issue of patents and of patents already issued, under the provisions of the general patent law, was determined. None of the decisions in those cases related to rights arising under special acts of congress. In the case at bar no patent under the general patent law was ever issued. In the decisions referred to, patents had issued in every case, and had issued under the general law alone. There, assignments made in contemplation of the provisions of the general law were construed by the court in the light of the provisions of the general law. Here, an assignment made in contemplation of the provisions of the general law in force in 1852 is to be construed with reference to the terms of a special law enacted 26 years afterwards. There, the rights of assignees were determined with reference to those of the inventors through whom in every case the assignees claimed. Here, the rights of an assignee are to be determined, not by those of his assignor existing under general laws, but by those of persons other than the assignor in favor of whom especially a special act is passed 21 years after the death of the assignor. There, patents had issued and been extended in every case under the general law. Here, every possibility of obtaining a patent under the general law had been hopelessly extinguished,—had been lost,—as is now apparent, by the laches of the assignee no less than of the personal representative of the inventor. Plainly, therefore, the case at bar differs very much from those of *Gaylor* v. *Wilder, Railroad Co.* v. *Trimble, Nicolson Pavement Co.* v. *Jenkins,* and *Hendrie* v. *Sayles.* This special act relieved Graham's heirs of the disabilities existing, and, preventing them from renewing and reviving an application by the administrator for a patent, authorized the administrator to renew the application; empowered the commissioner of patents to grant and issue letters patent for the Graham invention; directed that the patent, when issued, should have the same force and effect as though no delay had occurred in granting it; required that the invention should have been new and useful at the time of the original application; and saved to all persons having machines containing said invention in use at the time of the issuing of the patent, the right to continue the use of them without charge or molestation. Nothing is said of the rights of assignees of the invention. Those of persons having machines are carefully protected. Certainly, if congress had intended to save the former it would have so declared. On the maxim *expressio unius est exclusio alterius* we have a right to

infer that this omission was intentional. The right is given to the administrator for the benefit of the heirs. The only persons whose claims could be considered in competition with those of the heirs were the assignees, and congress gave the benefit of the patent to the heirs, omitting all mention or consideration of the assignees. The history of the case shows that a great public wrong had been put upon the inventor, and that the object of the act was to repair that injustice to the only persons to whom, in an historical point of view, justice could be rendered.

The act was intended as one of national gratitude. The thought of patching up bargains and making good losses of pocket was not in the mind of congress. The object was to make fair a blotted page in the national record. The disabilities referred to in the act existed as well against the assignee of the invention as against the heirs and administrator; and the act removed one class while omitting to remove the other. Through the operation of the general patent laws of 1836, 1837, 1861, 1870, and of the provisions of the Revised Statutes of 1874, all right to obtain a patent under the application of the inventor made in 1837 and again in 1851, had been lost, both to Graham and to Burton, and to the estates of each. These laws have invested the inventor's assignee as well as himself with a frequently revived right to prosecute the application. This was a legal right vested directly in Burton, and not a mere equitable right such as ordinarily has to be prosecuted in the name, and often at the pleasure, of the assignor. Burton was as much bound to prosecute the application with diligence, and was as effectually concluded by his laches, under the general patent laws of the country, and rules of practice obtaining in the patent-office at Washington, as the inventor himself. Graham's rights had been lost by the laches of the administrator in not availing of the two-years' privilege given by the law of 1861, the six-months' privilege given by the law of 1870, and of any privilege of similar character given under the Revised Statutes of 1874. Burton was alive during this period, and his rights under these several laws had been lost by his own personal laches. There was some equity on the part of congress in giving relief from laches committed by the administrator of a man dead since 1857, which did not exist in favor of a man who lived till 1877. Certain it was that all rights of each were utterly lost. No rights either of the estate of the inventor, or of Burton or Burton's estate, remained in 1878. A special act was as necessary to the revival of Burton's rights as of Graham's. Whatever rights might be conferred by such an act

could inure only to the persons in whose favor it should be granted. Congress did pass a special act expressly removing the disabilities of Graham's heirs, and omitting to remove those of Burton's representative; and yet we are asked to supply this marked omission by implication and judicial construction. Considering the national purpose for which the act was intended, it is eloquent by its silence concerning the lapsed rights of Burton, acquired by purchase with a pittance of money from a distressed, sick, and impoverished benefactor of mankind.

The fallacy of the claim of the complainant in this cause consists in the supposition that the heirs mentioned in the special act of June, 1878, being heirs of William A. Graham, take as if by descent from him; take as heirs an estate charged with all contracts and incumbrances made by him in his life-time. This is a radical misconception of the character of their title. On the contrary, they do not take at all from Graham; they take directly from the special act of congress. In technical phrase, assimilating their property to real estate, they take by purchase and not by descent. They are spoken of as heirs in the act; but this is mere *descriptio personæ.*

By way of illustration, let us suppose the following facts to have occurred: Smith grants to Brown by deed of January 13, 1852, for $500, all the right, title, and interest which he has or may acquire in a farm of 500 acres called Broad-acre, supposed to be worth $30,000. Smith is not in possession, but has a strong case both in equity and law, and is suing vigorously for the estate. The suit goes on for some years after the assignment, and Smith is finally cast. He thereupon appeals to a court of highest resort and is there defeated. His rights in Broad-acre dwindle down to *nil.* His title is utterly lost and worthless; and he dies. Twenty-one years after his death and twenty-five years after the date of his deed to Brown, the owner of Broad-acre, (we may call him Uncle Sam,) having some generous recollections of Smith and affection for Smith's heirs, makes a grant of Broad-acre to these heirs; neither mentioning, thinking of, nor having any concern for Brown. Can there be a doubt, in the mind of any lawyer, as to *how* the heirs of Smith take Broad-acre? They take by purchase, and not by descent. Brown bought on speculation, for $500, what, if he had succeeded, would have been worth $30,000. He got what he bought,—that is to say, he got Smith's right; which, instead of proving to be Broad-acre, proved to be *nil.* Uncle Sam's grant could not and was not intended to avail him.

It has only been recently since the supreme court of the United States rendered a decision which very pointedly illustrates the distinction between title by descent and by purchase.

In the case of *Wallach* v. *Van Riswick*, 92 U. S. 202, the land of the ancestor of the plaintiffs had been confiscated because of his participation with the confederates in the late civil war. Supposing that the confiscation could affect only his life estate, the ancestor had conveyed all his title after death to Van Riswick by deed, for full consideration. The question before the court was, whether this deed was valid; or else, whether the heirs did not take the estate in remainder, against the deed, by operation of the law of confiscation. The confiscation act of July 17, 1862, construed in conjunction with the resolution of the same date, declaring that "no proceedings under said act should be so construed as to work a forfeiture of the real estate of the offender beyond his natural life," was held by the court, while operating as a divestment of all possible estate of the offender in his real estate, yet to take effect as a grant of the estate in remainder to the heirs, and to confer upon them by purchase what they could not, under the law of confiscation, derive by descent from their ancestor. In that case, by force of an act of congress, the ancestor had lost all right in certain estates, and congress had, by another act, given it to his heirs. The supreme court held not only that the heirs took the estate, but that they took it in their own right, unaffected by and as against the deed of their ancestor; that is to say, that they took it by purchase. Of course this case of *Wallach* v. *Van Riswick* has no other application to the case at bar than as illustrating the principle I am discussing.

In the case at bar I hold that the title of the heirs to the patent granted by the special act of June 11, 1878, is in the nature of a title by purchase, and is not affected by the Burton assignment. I will sign a decree substantially in accordance with the prayer of the cross-bill of the administrator.