**AUDIO MPEG, INC., et al.,
Plaintiffs/Counterclaim
Defendants,**

**and**

**Societá Italiana per lo Sviluppo dell'Elettronica S.p.A., Third-Party Defendant,**

v.

**DELL INC.,
Defendant/Counterclaimant/Third-Party Plaintiff.**

Civil No. 2:15cv73 (Lead Case), Civil No. 2:16cv82 (Consolidated Case)

United States District Court,
E.D. Virginia,
Norfolk Division.

Signed 08/09/2017

---

Stephen E. Noona, Alexandra H. Moss, Garrard R. Beeney, Jamie L. Kringstein, Marc D. Leeuw, Matthew J. Porpora, Michael P. Devlin, Stephen J. Elliott, Wen-Ying A. Chang, William R. Kleysteuber, IV, Counsel for Audio MPEG, Inc., U.S. Philips Corporation, Orange SA, TDF SAS, Institut Fur Rundfunktechnik GmBh, Societa Italiana per lo Sviluppo Dell'Elettronica S.p.A.

Charles B. Molster, III, Aaron M. Panner, Benjamin J. Gottesman, Collin R. White, Derek T. Ho, Frederick G. Hall, Geoffrey M. Klineberg, Jacob E. Hartman, James M. Webster, III, John Thorne, Joseph S. Hall, Kenneth C. Todd, Nicholas Hunter, Rachel P. May, William Conyngham, Counsel for Dell, Inc.

## OPINION AND ORDER

Mark S. Davis, UNITED STATES DISTRICT JUDGE

This matter is before the Court on a motion for summary judgment filed by Dell Inc. ("Defendant" or "Dell"), on the claims alleged by Audio MPEG, Inc. ("Audio MPEG"), U.S. Philips Corporation ("Philips"), TDF SAS ("TDF"), and Institute fur Rundfunktechnik GmbH ("IRT") (collectively, "Plaintiffs"). ECF No. 417. For the reasons set forth below, the Court **DENIES** the motion for summary judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

The undisputed facts before the Court establish as follows: [1]

(1) This patent infringement action arises out of Dell's alleged infringement of the following audio technology patents: United States Patent No. 5, 323, 396 ("the '396 patent"), United States Patent No. 5,777,992 ("the '992 patent"), and United States Patent No. 5,539,829 ("the '829 patent") (collectively, the "asserted patents"). Compl. ¶¶ 19–46. The '396 patent and the '992 patent expired on June 21, 2011, id. ¶¶ 6, 30, and the '829 patent expired on July 23, 2013, id. ¶ 36; see generally Patents, Compl. Ex. 1, ECF No. 1–1.

(2) Through compression of audio files using MPEG Standards [2] to encode and decode digital audio signals, the patented technologies facilitate the playing of music and other audio on electronic devices. Compl. ¶¶ 2, 22.

(3) Plaintiffs Philips, TDF, and IRT ("Patent Owners"), own the asserted patents, id. ¶ 24, and plaintiff Audio MPEG has the exclusive right in the United States to license, sue, and collect fees, costs, and damages relating to infringe-

---

1. Such facts are assumed as true solely for the purposes of summary judgment.

2. MPEG Standards are worldwide industry standards for audio compression set by the MPEG/Audio Working Group of the International Organization for Standardization ("IOS"). Compl. ¶ 20.

ment of the asserted patents on behalf of all Plaintiffs, id. ¶ 41.

(4) Since 1996, Audio MPEG has offered a "joint license" on all of the Patent Owners' MPEG audio patents, including the asserted patents, prior to their expiration. Id. ¶ 42.

(5) Effective November 1, 2006, Audio MPEG executed a license agreement with Microsoft Corporation ("Microsoft") on behalf of the patent owners ("License Agreement"). License Agreement § 1.01 (eff. Nov. 1, 2006), Def.'s Summ. J. Ex. 7, ECF No. 423–4.

(6) The License Agreement authorized Microsoft "to make, have made, use, import, copy, have copied, sell, license, offer for sale or license, and otherwise distribute PC Software for use solely on Personal Computers." License Agreement § 2.02.

(7) Pursuant to the License Agreement, "PC Software" includes any "software product that (a) is solely for use on a Personal Computer, (b) is offered for license to or suitable for use by an end user, (c) is offered for license or distributed by LICENSEE or its Controlled Companies under LICENSEE's trademark or trade name, (d) is covered by at least one claim of the patent rights listed in Enclosure 1 or 2 and (e) conforms to the ISO/IEC 11172–3 or ISO/IEC 13818–3." License Agreement § 1.03.

(8) The License Agreement does not grant any "rights to any other software or product that decodes or receives the encoded or broadcast information," License Agreement § 2.04, and requires Microsoft to "include in its end user license agreement for PC Software a provision that the PC Software is intended for the end user's own use, is subject to certain intellectual property rights, and may not be commercially redistributed without LICENSEE'S consent," id. § 2.05.

(9) Microsoft paid $5,665,000.00 for the software license from Audio MPEG. License Agreement § 4.02.

(10) Microsoft agreed to "promptly notify their Computer Seller customers" that it had licensed audio patents from Audio MPEG for Microsoft's "PC Software for Personal Computers." License Agreement § 15.02. Further, Microsoft agreed to "notify their Computer Seller customers (1) that they obtain the benefit of LICENSEE'S PC Software license, and do not need to obtain a separate license from Audio MPEG or SISVEL for LICENSEE'S PC Software; and (2) that LICENSEE'S license covers only LICENSEE'S PC Software for Personal Computers and not any hardware or any other software capable of encoding or decoding MP3/MPEG Audio files." Id.

(11) Audio MPEG and Microsoft agreed that the terms of the License Agreement would be "governed by, interpreted and construed" according to the laws of the state of New York. License Agreement § 18.01.

(12) Microsoft distributes the Windows operating system, which includes MPEG-compliant code that compresses and decompresses audio files ("codecs"). See Fry Rebuttal Report ¶ 19 (Feb. 7, 2017), Pls.' Ex. RRR, ECF No. 475–12 (describing the codecs "contained in the Microsoft operating system"); Fry Suppl. Report ¶ 28 (Dec. 28, 2016), Pls.' Ex. CCC, ECF No. 475–3 ("A codec is a piece of software that encodes and/or decodes a digital data stream. Codecs typically exist as a part of a shared library, such as a DLL, so they can be utilized by more than one software program.").

(13) It is possible for non-Microsoft software products to use the Windows codecs by "calling the codecs." Pls.' Resp. Br. 12, ECF No. 472 ("Plaintiffs agree that cer-

tain versions of the Microsoft Windows operating system include codecs that are capable of being 'called' by non-Microsoft software.").

(14) Microsoft licensed its Windows operating system to Dell for installation on personal computers ("Microsoft–Dell License Agreement"). See Microsoft–Dell License Agreement § 2(a) (eff. Aug. 1, 2009), Def.'s Summ. J. Ex. 11, ECF No. 423–8; Pls.' Resp. Br. 12.

(15) Dell sold at least one computer that included a non-Microsoft program that allowed a user to play MPEG-compatible audio files. Pls.' Resp. Br. 12.

In addition to the above undisputed facts, Dell alleges, and Plaintiffs disagree, (1) that the Audio MPEG–Microsoft License Agreement included a license for third party software to "call" the Windows codecs for compressing or decompressing audio files, and (2) that the allegedly infringing software actually calls the Windows codecs. Compare Def.'s Opening Br. 7, ECF No. 422 (arguing that the allegedly infringing software does "not contain software code capable of performing any of the asserted claims"); with Pls.' Resp. Br. 12 (arguing that the allegedly infringing software "contain[s] source code capable of performing the Asserted Claims").

## B. Procedural Background

On February 20, 2015, Plaintiffs filed a three-count complaint in the Norfolk Division of this Court alleging that Hewlett–Packard Company ("HP") infringed the asserted patents. See generally HP Compl., ECF No. 1. On December 21, 2015, Plaintiffs filed a three-count complaint against Dell in the Alexandria Division of this Court alleging that Dell infringed the asserted patents. Compl., Audio MPEG, Inc., et al. v. Dell Inc., No. 1:15cv1674 (E.D. Va. 2015). On February 22, 2016, the Alexandria Division transferred the Dell case to the Norfolk

Division to be consolidated with the HP case. No. 2:15cv73, ECF No. 73. On May 16, 2016, Plaintiffs and HP settled, leaving Dell as the sole remaining defendant in the case. Hr'g Tr. 3:22–4:16, ECF No. 136.

Plaintiffs allege that Dell directly infringed claims in the asserted patents by "manufacturing, using, selling, importing, and/or offering for sale products that include capabilities required by the MPEG standards, including, but not limited to[,] Dell computers and electronic devices containing Cyberlink PowerDVD (such as Latitude D530, Latitude D630, Latitude D830, and Dell Precision M6300) or Roxio Creator (such as Latitude D630)." Compl. ¶¶ 51, 60, 69. Plaintiffs also allege that Dell indirectly infringed claims in the asserted patents by inducing and contributing to infringement by others. Id. ¶¶ 52–53, 61–62, 70–71. Plaintiffs further allege that Dell continued its infringing activities even after Audio MPEG informed Dell, no later than July 1, 2004, that "all Defendant's products incorporating the MPEG Audio encoding and decoding capabilities required by at least one of the MPEG standards are covered by [the asserted patents]." Id. ¶¶ 52, 61, 70.

In response, Dell denies that the patents were "duly and legally issued," Answer ¶¶ 47, 56, 65, ECF No. 184, arguing that the patents are invalid because the inventors failed to satisfy the conditions of patentability specified in 35 U.S.C. § 100, et seq., Aff. Defenses ¶ 1, ECF No. 184. Further, Dell denies that it has directly or indirectly infringed on the patents. Answer ¶¶ 51–53, 60–62, 69–71. Dell asserts defenses of prosecution history estoppel; exhaustion; license; waiver, laches, and/or estoppel; patent misuse; prosecution laches; and argues for a limit on any damages. Aff. Defenses ¶¶ 2–22. Finally, in its

Counterclaim, Dell asserts that Plaintiffs, together with Counterclaim Defendant Società Italiana per lo Sviluppo dell'Elettronica S.p.A. ("SISVEL"), committed violations of the Sherman Act, civil conspiracy under Virginia state law, common law conspiracy, breach of contract, promissory estoppel, waiver, and prosecution laches (collectively, the "antitrust claims"). Countercl. ¶¶ 152–224.

On February 28, 2017, Dell filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, arguing that "[t]he doctrine of patent exhaustion bars Plaintiffs' claims of infringement as to any Dell computers containing software products that rely on MPEG-compliant codecs in the Microsoft Windows operating system to encode or decode MPEG-compliant audio files." ECF No. 417.[3] On March 14, 2017, Plaintiffs filed a response in opposition to Dell's motion for summary judgment, ECF No. 470, and Dell filed a reply on March 20, 2017, ECF No. 520.

On the same day, the case was reassigned to the undersigned Judge. In a telephonic status conference with the parties on April 24, 2017, the Court reviewed the case status with the parties and explained that it would rule on the pending motion to bifurcate and would consult with the co-assigned Magistrate Judge regarding the pending motions in limine. Status Conf. Tr. 65–66, ECF No. 616. The Court recommended that, after receiving its bifurcation ruling, the parties consider returning to settlement discussions. Id. On May 31, 2017, the Court granted the request to bifurcate the trial of Plaintiffs'

patent infringement claims from Dell's antitrust claims, and set trial on Plaintiffs' patent infringement claims to begin on December 5, 2017. ECF No. 619.

On May 30, 2017, Plaintiffs filed a notice of supplemental authority, advising the Court of the United States Supreme Court's decision released that morning in Impression Products, Inc. v. Lexmark International, Inc., No. 15–1189 (May 30, 2017), on the issue of patent exhaustion. ECF No. 617. The following day, Dell filed a response to Plaintiffs' notice of supplemental authority. ECF No. 618. On June 1, 2017, Plaintiffs filed a reply to the notice of supplemental authority, ECF No. 624, and Dell then filed its own reply on June 6, 2017, ECF No. 627. On July 31, 2017, Plaintiffs filed a motion for leave to file a supplemental memorandum on Dell's motion for summary judgment, on the basis of newly obtained information. ECF No. 670. The Court granted this motion on August 1, 2017. ECF No. 691.

Having been fully briefed and considered by this Court, Dell's motion for summary judgment is ripe for review.

## II. LEGAL STANDARD

### A. Summary Judgment

The Federal Rules of Civil Procedure provide that a district court "shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 568 (4th Cir. 2015).[4] "[T]he mere existence of some

---

**3.** Dell also requested summary judgment on the doctrine of laches, ECF No. 417, but withdrew this argument after the United States Supreme Court rejected the equitable defense of laches in patent suits, ECF No. 523; see SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC, —— U.S. ——,

137 S.Ct. 954, 967, 197 L.Ed.2d 292 (2017) ("Laches cannot be interposed as a defense against damages where the infringement occurred within the period prescribed by [statute].").

**4.** In evaluating a motion for summary judgment in a patent case, the Court applies the

alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248, 106 S.Ct. 2505; see Jacobs, 780 F.3d at 568.

When a moving party "seeks summary judgment on an affirmative defense, it must conclusively establish all essential elements of that defense." Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc., 673 F.3d 294, 299 (4th Cir. 2012) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 331, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); Helferich Patent Licensing, LLC v. N.Y. Times Co., 778 F.3d 1293, 1299 (Fed. Cir. 2015) ("Patent exhaustion may be decided by summary judgment when there are no such genuine disputes of material fact." (citing Keurig, Inc. v. Sturm Foods, Inc., 732 F.3d 1370, 1373 (Fed. Cir. 2013))). If the moving party produces "sufficient evidence in support of its affirmative defense, the burden of production shifts" to the non-movant to identify facts demonstrating a genuine issue for trial. Ray Commc'ns, 673 F.3d at 299. If the moving party fails to produce sufficient evidence, "summary judgment must be denied ... for the non-movant is not required to rebut an insufficient showing." Id. (citation omitted).

At the summary judgment phase, a district court is not permitted "to weigh the evidence and determine the truth of the matter," but must instead "determine whether there is a genuine issue for trial."

summary judgment standard of the regional circuit—here, the standard of the United States Court of Appeals for the Fourth Cir-

Tolan v. Cotton, —— U.S. ——, 134 S.Ct. 1861, 1866, 188 L.Ed.2d 895 (2014) (quoting Anderson, 477 U.S. at 249, 106 S.Ct. 2505). Accordingly, "[t]he relevant inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Stewart v. MTR Gaming Grp., Inc., 581 Fed.Appx. 245, 247 (4th Cir. 2014) (quoting Anderson, 477 U.S. at 251–52, 106 S.Ct. 2505). In making such determination, the Court must consider the record evidence "'in the light most favorable to the' nonmoving party." Jacobs, 780 F.3d at 568 (quoting Tolan, 134 S.Ct. at 1866).

### B. Patent Exhaustion

■ The Patent Act "promote[s] the progress of science and the useful arts by granting to the inventor a limited monopoly, ... [that] enable[s] the inventor] to secure the financial rewards for his invention." United States v. Univis Lens Co., 316 U.S. 241, 250, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942). The Patent Act grants to patentees the "right to exclude others from making, using, offering for sale, or selling the invention." 35 U.S.C. § 154(a)(1). However, "[f]or over 160 years, the doctrine of patent exhaustion has imposed a limit on that right to exclude," by recognizing that an authorized sale of the patented article exhausts the right to exclude. Impression Prod., Inc. v. Lexmark Int'l, Inc., —— U.S. ——, 137 S.Ct. 1523, 1531, 198 L.Ed.2d 1 (2017) (citing Bloomer v. McQuewan, 14 How. 539, 55 U.S. 539, 14 L.Ed. 532 (1852)). "This well-established exhaustion rule marks the point where patent rights yield to the common law principle against restraints on alienation." Id. "As Lord Coke put it in the 17th century, if an owner restricts the resale or use of an item

cuit. MicroStrategy Inc. v. Bus. Objects, S.A., 429 F.3d 1344, 1349 (Fed. Cir. 2005).

after selling it, that restriction 'is voide, because ... it is against Trade and Traffique, and bargaining and contracting betweene man and man.'" Id. at 1532 (citing 1 E. Coke, Institutes of the Laws of England § 360, p. 223 (1628)).

At its core, the doctrine of patent exhaustion is straightforward: a patent grants an inventor the right to exclude all others from making, using, and selling his invention, but a patentee surrenders this monopoly through an authorized sale of his invention. Univis, 316 U.S. at 250, 62 S.Ct. 1088; see Quanta Computer, Inc. v. LG Elecs., Inc., 553 U.S. 617, 625, 128 S.Ct. 2109, 170 L.Ed.2d 996 (2008) ("[T]he initial authorized sale of a patented item terminates all patent rights to that item."). The inventor's "monopoly remains so long as he retains the ownership of the patented article. But sale of it exhausts the monopoly in that article and the patentee may not thereafter, by virtue of his patent, control the use or disposition of the article." Univis, 316 U.S. at 250, 62 S.Ct. 1088. "[O]nce a patentee sells an item, it has 'enjoyed all the rights secured' by that limited monopoly." Impression Prod., 137 S.Ct. at 1532 (quoting Keeler v. Standard Folding Bed Co., 157 U.S. 659, 661, 15 S.Ct. 738, 39 L.Ed. 848 (1895)). "Because 'the purpose of the patent law is fulfilled ... when the patentee has received his reward for the use of his invention,' that law furnishes 'no basis for restraining the use and enjoyment of the thing sold.'" Id. (quoting Univis, 316 U.S. at 251, 62 S.Ct. 1088). Any other rule "would clog the channels of commerce," with "advances in technology ... magnify[ing] the problem." Id. (noting that a "generic smartphone ... could prac-

tice an estimated 250,000 patents" (citing Br. for Intel Corp. et al. as Amici Curiae 17 n.5)).

In order for a patentee's rights to be exhausted, there must be (1) an authorized sale (2) of an article that "substantially embodies" the patent. Quanta, 553 U.S. at 638, 128 S.Ct. 2109. To have an "authorized sale," a patentee may either directly sell their invention or may authorize someone else to sell their invention through a license agreement. Id. at 636, 128 S.Ct. 2109 (looking at the specific language of a license agreement to determine whether a licensee's sale of the invention was "authorized" by the patentee). When a patentee authorizes someone else to sell their invention under a license agreement, "[s]o long as a licensee complies with the license when selling an item, the patentee has, in effect, authorized the sale." Impression Prod., 137 S.Ct. at 1535; see also Rembrandt Data Techs., LP v. AOL, LLC, 641 F.3d 1331, 1335 (Fed. Cir. 2011) (affirming district court's grant of summary judgment on the basis that a sale by a sublicensee exhausted patentee's rights).

Because "a license is not about passing title to a product," a license does not exhaust a patentee's rights under the doctrine of patent exhaustion, but it does "chang[e] the contours of the patentee's monopoly: the patentee agrees not to exclude a licensee from making or selling the patented invention, expanding the club of authorized producers and sellers." Impression Prod., 137 S.Ct. at 1534 (citing United States v. Gen. Elec. Co., 272 U.S. 476, 489–490, 47 S.Ct. 192, 71 L.Ed. 362 (1926)) (emphasis added).[5] Thus, while a license

---

5. A patentee's agreement not to exclude (i.e. a non-exclusive patent license) "is equivalent to a covenant not to sue." TransCore, LP v. Elec. Transaction Consultants Corp., 563 F.3d 1271, 1275 (Fed. Cir. 2009); see De Forest

Radio Tel. Co. v. United States, 273 U.S. 236, 242, 47 S.Ct. 366, 71 L.Ed. 625 (1927) ("If a licensee be sued, he can escape liability to the patentee for the use of his invention by showing that the use is within his license. But if his

agreement does not exhaust a patentee's rights, if a licensee sells, in accordance with the terms of the license agreement, a product that embodies the patent, the licensee's sale exhausts the patentee's rights in the item because the "licensee's sale is treated, for purposes of patent exhaustion, as if the patentee made the sale itself." Id. (citing Hobbie v. Jennison, 149 U.S. 355, 362–363, 13 S.Ct. 879, 37 L.Ed. 766 (1893)); see High Point Sarl v. T–Mobile USA, Inc., 53 F.Supp.3d 797, 805 (D.N.J. 2014) (holding that sales by a sub-licensee were authorized by the patentee's license agreement with the licensee for purposes of patent exhaustion). Conversely, "if a patentee has not given authority for a licensee to make a sale, that sale cannot exhaust the patentee's rights." Impression Prod., 137 S.Ct. at 1535 (emphasis added); accord, Monsanto Co. v. Scruggs, No. CIV. A.3:00CV-161-P-D, 2009 WL 536833, at *1 (N.D. Miss. Mar. 3, 2009) (holding that a licensee's sale was "unauthorized" because the sale violated the terms of the license agreement). Finally, an item "substantially embodies" the patent if the item has "no reasonable noninfringing use and include[s] all the inventive aspects of the patented methods." Quanta, 553 U.S. at 638, 128 S.Ct. 2109.

## III. DISCUSSION

Dell argues that, to the extent Plaintiffs' patent infringement claims involve the use of codecs included in the Windows operating system, the Court should grant summary judgment to Dell because Microsoft's sale of Windows to Dell exhausted Plaintiffs' patent rights as to the Windows codecs. Def.'s Opening Br. 13. According to Dell, Microsoft's Windows operating system contained codecs that encode and/or decode digital audio data; these codecs thus substantially embodied the patents in suit; Plaintiffs authorized Microsoft to sell the Windows operating system to Dell pursuant to a license agreement; and the allegedly infringing software solely used the Windows codecs to encode/decode audio data. Id. In response, Plaintiffs principally argue that summary judgment is not appropriate because there are genuine disputes of material fact, and, even if the facts were undisputed, Plaintiffs' license agreement with Microsoft could not exhaust Plaintiffs' patent rights because the agreement was a license and not a sale for purposes of patent exhaustion. Pls.' Resp. Br. 16–25, ECF No. 472.

In evaluating a motion for summary judgment, the Court must determine

---

use be one prohibited by the license, the latter is of no avail as a defense. As a license passes no interest in the monopoly, it has been described as a mere waiver of the right to sue by the patentee." (citing Robinson on Patents §§ 806 & 808)); Carborundum Co. v. Molten Metal Equip. Innovations, Inc., 72 F.3d 872, 878 (Fed. Cir. 1995) ("[A]ll or part of the right to exclude may be waived by granting a license."). Thus, if a patented item is transferred pursuant to a license agreement, the licensee has a defense of licensure against the patentee's infringement suit. Carborundum, 72 F.3d at 878 ("[A]n express license[] is a defense to patent infringement."). A third party to a license agreement may also assert a license defense if the third party's actions are within the scope of the license agreement between the patent owner and the licensee.

See Aro Mfg. Co. v. Convertible Top Replacement Co., 377 U.S. 476, 497, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964) (holding that a third party was not liable for contributory infringement because the patentee authorized a manufacturer to sell a product to consumers, consumers had a "license" to use the product, and therefore a third party's repair of the product was not infringement). The Court notes that the instant summary judgment motion only encompasses Dell's argument that Microsoft's license agreement with Dell constituted an authorized sale such that Plaintiffs' patent rights were exhausted in Dell's computers, and while Dell asserts licensure as its fifth defense, the instant summary judgment motion does not include the defense of licensure as an alternative argument to the defense of exhaustion.

whether there is any "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). Based upon the parties' submissions, there appear to be two broad factual claims that are disputed: (1) whether the Audio MPEG–Microsoft License Agreement included third party software access to the Windows codecs, and (2) whether the allegedly infringing software only called the Windows codecs or also included internal audio compression and/or decompression functionality.

## A. Audio MPEG–Microsoft License Agreement

▮ Dell argues that the Audio MPEG–Microsoft License Agreement included a license for third party software to use the Windows codecs by "calling" the codecs.[6] Def.'s Opening Br. 10. Plaintiffs disagree, arguing that the language of the License Agreement does not allow for this interpretation. Pls.' Resp. Br. 16. The Audio MPEG–Microsoft License Agreement stipulated that the Agreement would be "governed by, interpreted and construed in accordance with" the laws of the state of New York. License Agreement § 18.01. Therefore, this Court looks to New York

contract law to determine the interpretation of a term in a contract when the parties disagree.[7]

▮ Under New York contract law, the Court begins with the language of the contract itself. If the contract term is unambiguous, interpretation " 'is a function for the court, and matters extrinsic to the agreement may not be considered when the intent of the parties can be gleaned from the face of the instrument.' " Chimart Assocs. v. Paul, 66 N.Y.2d 570, 572–73, 498 N.Y.S.2d 344, 489 N.E.2d 231 (1986) (quoting Teitelbaum Holdings, Ltd. v. Gold, 48 N.Y.2d 51, 56, 421 N.Y.S.2d 556, 396 N.E.2d 1029 (1979)). Unless the Court determines that a term is ambiguous, it may not allow extrinsic or parol evidence to be introduced to determine the parties' intent. See R/S Assocs. v. N.Y. Job Dev. Auth., 98 N.Y.2d 29, 33, 744 N.Y.S.2d 358, 771 N.E.2d 240 (2002) (" 'Extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face.' " (quoting W.W.W. Assocs. v. Giancontieri, 77 N.Y. 2d 157, 163, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990))). The

---

6. The Court notes that, while Dell's licensure defense is not currently before the Court, whether the Audio MPEG–Microsoft License Agreement authorized third party software to "call" the Window's codecs is a relevant question to both Dell's patent exhaustion defense and licensure defense. It is relevant to Dell's patent exhaustion defense to determine whether the patentee (Audio MPEG) authorized the licensee (Microsoft) to sell an item embodying the patent (codecs within the Window's operating system). Quanta, 553 U.S. at 638, 128 S.Ct. 2109 ("The authorized sale of an article that substantially embodies a patent exhausts the patent holder's rights."). It is relevant to Dell's licensure defense to determine whether the patentee (Audio MPEG) authorized the licensee (Microsoft) to license an item embodying the patent, such that the patentee (Audio MPEG) effectively covenanted not to sue the second licensee (Dell) for patent infringement. See Silicon Graphics, Inc. v.

ATI Techs., Inc., 607 F.3d 784, 793 (Fed. Cir. 2010) (citing with approval the district court's statement that the "licensed use of a product does not constitute . . . infringement").

7. "[Courts] treat an agreement granting patent rights as a contract and interpret its terms consistent with the choice of law provision in the agreement in question." Diamond Coating Techs., LLC v. Hyundai Motor Am., 823 F.3d 615, 618 (Fed. Cir. 2016); see Silicon Graphics, Inc. v. ATI Techs., Inc., 607 F.3d 784, 801 (Fed. Cir. 2010) (applying Delaware law because it governed the license agreement at issue); Kaneka Corp. v. SKC Kolon PI, Inc., No. CV 11-3397, 2015 WL 12683971, at *4 (C.D. Cal. June 25, 2015) (applying Federal procedural law but Japanese substantive law because the contract at issue was executed in Japan).

parties may not offer parol evidence that contradicts or varies the terms of the written agreement. Sabo v. Delman, 3 N.Y.2d 155, 161, 164 N.Y.S.2d 714, 143 N.E.2d 906 (1957).

 A term is ambiguous if it "is reasonably susceptible of more than one interpretation." Chimart Assocs., 66 N.Y.2d at 573, 498 N.Y.S.2d 344, 489 N.E.2d 231; see also Law Debenture Trust Co. v. Maverick Tube Corp., 595 F.3d 458, 466 (2nd Cir. 2010) ("An ambiguity exists where the terms of the contract 'could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" (quoting Int'l Multifoods Corp. v. Comm. Union Ins. Co., 309 F.3d 76, 83 (2nd Cir. 2002))). Ambiguities in a contract are construed "against the party who prepared or presented it." 151 West Assocs. v. Printsiples Fabric Corp., 61 N.Y.2d 732, 734, 472 N.Y.S.2d 909, 460 N.E.2d 1344 (1984). Whether a term is ambiguous is determined by the court as a matter of law. W.W.W. Assocs., 77 N.Y.2d at 162, 565 N.Y.S.2d 440, 566 N.E.2d 639. Once a court has determined that a term is ambiguous, there is a genuine dispute over a material fact such that summary judgment is inappropriate. Fed. R. Civ. P. 56; see Dean v. Tower Ins. Co. of N.Y., 19 N.Y.3d 704, 709, 955 N.Y.S.2d 817, 979 N.E.2d 1143 (2012) (holding that summary judgment was inappropriate because a contract term was ambiguous).

In this case, the parties disagree about whether the Microsoft Windows codecs are included in the Audio MPEG–Microsoft License Agreement as "PC Software" and thus licensed for use by third party software operating in Windows. This dispute is over interpretation of the contract term: "PC Software." Dell argues that access to the Windows codecs by third party software was included in the License Agreement because the codecs are part of Windows, which is "PC Software" distributed by Microsoft. Def.'s Opening Br. 13 ("Windows is PC Software under § 1.03 of the Agreement—a Microsoft-branded end-user software product used on personal computers and capable of decoding MPEG-compliant audio signals."). Plaintiffs disagree. Pls.' Resp. Br. 16 ("Plaintiffs disagree that the codecs constitute 'PC Software' as that term is defined in the Microsoft License.").

Because this is a matter of contract interpretation, the Court begins by determining whether the language of the contract is unambiguous. Chimart Assocs., 66 N.Y.2d at 572, 498 N.Y.S.2d 344, 489 N.E.2d 231. The License Agreement authorized Microsoft "to make, have made, use, import, copy, have copied, sell, license, offer for sale or license, and otherwise distribute PC Software for use solely on Personal Computers." License Agreement § 2.02 (emphasis added). "PC Software" includes any "software product that (a) is solely for use on a Personal Computer, (b) is offered for license to or suitable for use by an end user, (c) is offered for license or distributed by LICENSEE or its Controlled Companies under LICENSEE'S trademark or trade name, (d) is covered by at least one claim of the patent rights listed in Enclosure 1 or 2 and (e) conforms to the ISO/IEC 11172–3 or ISO/IEC 13818–3." Id. § 1.03 (emphasis added). The License Agreement explicitly excludes any "rights to any other software or product that decodes or receives the encoded or broadcast information," id. § 2.04, and requires Microsoft to "notify their Computer Seller customers ... (2) that LICENSEE'S license covers only LICENSEE'S PC Software for Personal Computers and

not any hardware or any other software capable of encoding or decoding MP3/MPEG Audio files," id. § 15.02 (emphasis added).

Based upon the language of the contract, it is unambiguous that Microsoft software that either has the capacity to encode/decode audio files or that calls the Windows codecs is covered by the License Agreement terms as PC Software. See id. §§ 1.03, 2.02. Conversely, it is also unambiguous that third party software that is "capable of encoding or decoding" audio files is not licensed under this contract. See id. §§ 2.04, 15.02. However, as explained below, because the contract terms are "reasonably susceptible of more than one interpretation" regarding third party software, the Court finds that License Agreement language is ambiguous regarding the licensing of third party software that calls the Windows codecs. See Chimart Assocs., 66 N.Y.2d at 573, 498 N.Y.S.2d 344, 489 N.E.2d 231.

With regards to the licensing of third party software that calls the Windows codecs, the contract language could reasonably be interpreted to mean that third party software that calls the Windows codecs is covered by the license because the audio encoding/decoding functionality is exclusively provided by the Microsoft Windows operating system, a software program designed for use by end users on their computers. Further, the contract explicitly excludes third party software that is capable of encoding/decoding audio files, but does not exclude third party software that itself does not have encoding/decoding functionality. License Agreement § 2.04. By contrast, the contract language could reasonably be interpreted to mean that third party software is not covered because (1) only Microsoft products that encode/decode audio files are licensed, (2) the codecs within Windows are not designed for use by end users, and (3) third party software that is "MPEG compatible" is clearly excluded. Id. § 2.04. Finally, while the contract expressly contemplates that Windows would be "used ... in combination with" other products, it also unequivocally states that such use "does not convey any express or implied license to ... any other software product that is not PC Software." Id. Thus, because the license term "PC Software" could reasonably be interpreted in two different ways, the Court finds that the contract language is ambiguous.

■ Both parties have submitted hundreds of pages of parol evidence to demonstrate the intent of Plaintiffs and Microsoft. These documents include numerous emails between Audio MPEG and Microsoft negotiating the specific terms of the License Agreement, multiple copies of the License Agreement showing the edits made to it before it was finalized, meeting minutes, handwritten notes, a notification to Microsoft's customers regarding what the Microsoft license covered, various letters between counsel describing the parties' respective positions regarding what the Microsoft license covered, and deposition testimony regarding what occurred in the license negotiations and what the parties understood the license to cover. See generally Pls.' Summ. J. Exs.; Def.'s Summ. J. Exs. Because the Court has determined that the Audio MPEG–Microsoft License Agreement is ambiguous, the fact finder, the jury in this case, is responsible for determining the intent of the parties from the extrinsic evidence. Hartford Accident, 33 N.Y.2d at 172, 350 N.Y.S.2d 895, 305 N.E.2d 907. Thus, the Court finds that Plaintiffs and Dell genuinely disagree on whether third party software that calls a Windows codec is considered "PC software" under the License Agreement, and the Court cannot resolve

this disagreement by looking to parol evidence at the summary judgment stage of the case.

In addition to being genuine, the parties' dispute is material because if the Windows codecs are included under the License Agreement and the third party software calls the Windows codecs, this third party software would not infringe the patents-in-suit under the terms of the applicable license agreements. However, if the Windows codecs are not considered "PC Software" under the Audio MPEG–Microsoft License Agreement, and thus are not licensed to allow third party software access, then, regardless of whether the infringing software calls the Windows codecs (the second genuine dispute of material fact), the software would still allegedly infringe the patents in suit. Because there is a genuine dispute about a material fact—the meaning of a term in the License Agreement—the Court **DENIES** Dell's motion for summary judgment on this basis.

## B. Allegedly Infringing Software

Alternatively, even if the Court were to find that the License Agreement covered third party software calling the Windows codecs, the parties disagree about whether the allegedly infringing software (Cyberlink, Roxio, and Nero) only uses the Windows codecs, or whether the software contains code independently capable of performing the asserted claims of the patents in suit. It is undisputed that electronic devices capable of encoding and/or decoding digital audio signals based upon the international MPEG Standard necessarily practice the patented technologies. See Compl. ¶¶ 19–23, 44 ("All products, however, that are capable of decoding an audio signal that has been encoded in compliance with the MPEG Standards necessarily infringe the Asserted Patents."). The parties further appear to agree that software may practice the patented technology by either containing internal audio compression and/or decompression code or by calling such code from the computer operating system. However, the parties vigorously disagree over whether the allegedly infringing software contains audio code independently capable of performing the asserted claims of the patents in suit or calls such code from the Windows operating system.

Dell argues that:

10. CyberLink and Nero do not contain software code capable of performing any of the asserted claims of Plaintiffs' patents. Plock Suppl. Rep. ¶¶ 14–15; Pope Suppl. Rep. ¶¶ 108–110.

11. Rather, both call codecs in the Windows operating system . . . .

. . .

25. Following inquiry from Dell in 2011, Rovi, which distributed Roxio, affirmed that Roxio software relied on MPEG-compliant codecs in Windows for encodings and decoding and had "never included separate MP3 decode functionality." Email from C. Anson to M. Connors re: Sisvel (Oct. 10, 2011), DELL–AudioMPEG–0087077–83 (May Decl. Ex. 26) . . . .

Def.'s Opening Br. 11, 14 (emphasis added); see also Plock Suppl. Report ¶¶ 14–15 (Dec. 28, 2016), Pls.' Ex. BBB, ECF No. 475–2 ("It is also my opinion that for the functions tested, CyberLink software uses Windows-provided codecs to decode/playback MPEG standard-compliant audio. I also determined that Nero 9 uses the Windows-provided decoder ... during MP3 playback."); Email from B. Healy to M. Connors re: Sisvel (Oct. 11, 2011), Def.'s Ex. 27, ECF No. 424–12 ("Roxio Creator Starter does not expose any MP3 encoding functionality to the user nor does it include a functional MP3 decoder or encoder." (emphasis added)); Fry Suppl. Report ¶ 4

(Dec. 28, 2016), Pls.' Ex. CCC, ECF No. 475–3 ("All of the software packages I analyzed were designed to rely on Microsoft libraries in the Windows OS to decode MP3 files.").

Plaintiffs disagree that the allegedly infringing software solely uses the Windows codecs for audio encoding/decoding functionality: ·

> 10–12. Disputed. CyberLink and Nero software contain source code capable of performing the Asserted Claims. . . .
>
> . . .
>
> 25. Disputed. Plaintiffs dispute that Rovi "affirmed that Roxio software relied on MPEG-compliant codecs in Windows." (Dell Mem. at 10.) The evidence cited by Dell refers specifically to Roxio Creator Starter, not "Roxio software" generally. (*See id.*; May Ex. 26; May Ex. 27.)

Pls.' Resp. Br. 16–18 (emphasis added). Plaintiffs' expert prepared a rebuttal report, stating that, in his opinion, "a significant portion of the accused Dell products that contain Accused Software do not use codecs or libraries included in Microsoft Windows to carry out MP3 or MP2 decoding or encoding," and specifically the Roxio software packages "do not utilize a codec included in Windows to decode MP3 files." Plock Rebuttal Report 1–2 (Feb. 2, 2017), pls.' Ex. ZZ, ECF No. 474–26.[8] Additionally, Aleks Mehrle testified in his deposition that CyberLink had approached Audio MPEG to request a license because it was "proud" that CyberLink "had the best performing" audio codec. Dep. Aleks Mehrle 336:20–24, Pls.' Ex. H, ECF No. 473–8.

On July 31, 2017, Plaintiffs requested leave to file a supplemental memorandum offering new evidence to support their claim that CyberLink used a codec provided by CyberLink, not a Windows codec as claimed by Dell. ECF No. 670–2. Such evidence includes testimony by CyberLink Taiwan's corporate representative, Senior Deputy General Manager Mei–Chun Ku, before the Taiwan Taipei District Court, in which Ms. Ku testified that "[a]ll the five [CyberLink] products use only one Microsoft MPEG Audio decoder;. only CyberLink Media Suite Premium uses a CyberLink MPEG Audio encoder." ECF No. 671–1, at 21. Plaintiffs also offered a supplemental expert report analyzing the source code provided by CyberLink Taiwan. While Plaintiffs' expert acknowledged that "[t]he source code produced by CyberLink . . . is incomplete in several ways that frustrate a complete analysis of its operation," he nevertheless "determined that these CyberLink products, when included in a Dell computer, use a codec not included in Microsoft Windows to decode audio tracks on MPEG–2 encoded DVDs." Pope 2d Suppl. Report ¶¶ 14–15 (July 14, 2017), Pls.' Ex. B, ECF No. 671–2 (emphasis added).

While "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," the Court cannot grant a motion for summary judgment if there is a genuine dispute over a "material fact." Id. at 247–48. Here, the fact in dispute (whether the allegedly in-

---

**8.** The parties' experts disagreed over how the Roxio software operated. Plaintiffs' expert describes Dell's expert as "tamper[ing]" with the Roxio software "in an attempt to show that, in theory, the Windows MP3 libraries could be utilized were it not for the purported 'defect.'" Plock Rebuttal Report at 19. According to Plaintiffs' expert, Dell's expert "hack[ed]" the software and "change[d] a feature so the software would operate according to [Plaintiffs' expert's] expectation, rather than operate according to how the software was actually designed." Id. at 20. In light of the disagreement between experts, Dell limited its motion for summary judgment to only Dell computers sold with CyberLink or Nero products. Dell Opening Br. 2 n.1.

fringing software includes MPEG-compliant code or whether it only operates by calling the Windows codecs) is material because it "might affect the outcome of the suit." Id. at 248. If the allegedly infringing software includes internal audio compression and/or decompression capability, then the software would allegedly infringe the patents in suit regardless of whether the software may also call the Windows codecs. As noted above, both parties cite to numerous documents and expert opinions in support of their factual position, indicating a genuine dispute because "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S.Ct. 2505. Therefore, the Court concludes that this fact is genuinely disputed and material to the outcome of the decision. Based upon this finding, the Court **DENIES** Dell's motion for summary judgment because the parties genuinely dispute material facts.

## IV. CONCLUSION

Having determined that material facts are genuinely disputed by the parties, the Court **DENIES** Dell's motion for summary judgment. ECF No. 417.

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to counsel for Plaintiffs and to counsel for Dell.

**IT IS SO ORDERED.**